438 S.E.2d 596

**CENTRAL WEST VIRGINIA REFUSE, INC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Appellee.**

**No. 21750.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1993.

Decided Dec. 13, 1993.

Arden J. Curry, Pauley, Curry, Sturgeon & Vanderford, Charleston, for appellant.

Richard M. Allen, Public Service Comm'n of West Virginia, Charleston, for appellee.

MILLER, Justice:

Central West Virginia Refuse, Inc., (Central), appeals a final order of the Public Service Commission (PSC), dated March 10, 1993, that reduced the base tariff rate Central could charge its customers from $27.45 to $21.58 per ton. On appeal, Central alleges two errors: (1) the PSC exceeded its statutory authority when it refused to follow its earlier decision in the original tariff case involving Central, and (2) the evidence was inadequate to support several of the PSC's findings. We have reviewed the record and find no error; accordingly, we affirm the final order of the PSC.

## I.

Central owns and operates a solid waste disposal facility in Braxton County. In 1989, the PSC was given jurisdiction over the establishment and enforcement of rates and fees charged by commercial solid waste facilities.[1]

In July of 1989, Central was required to file an original tariff request with the PSC. The application filed by Central, which was assigned Case No. 89-405-SWF-T, requested a rate of $32.00 per ton. This amount included a base rate of $29.25 per ton, a State assessment fee of $1.25, a county assessment fee of $0.50 per ton, and a solid waste interim fee of $1.00 per ton, for a total assessment of $2.75. This rate was accepted by the PSC on an interim basis without an

---

1. The PSC's jurisdiction was originally codified in W.Va.Code 24-2-1d, but has since been changed to W.Va.Code 24-2-1f. W.Va.Code 24-2-1f, states, in pertinent part: "Effective the first day of July, one thousand nine hundred and eighty-nine, in addition to all other powers and duties of the [PSC] as defined in this article, the [PSC] shall establish, prescribe and enforce rates and fees charged by commercial solid waste facilities[.]"

audit or review, and, subject to refund, became effective on or after July 1, 1989.

Because staff had not yet conducted its audit, on May 9, 1991, the Administrative Law Judge (ALJ) issued a recommended decision that Case No. 89–405–SWF–T be dismissed from the docket. The PSC did not adopt the ALJ's recommended decision and instead remanded the case for a hearing. After hearings were held, the ALJ recommended that the $29.25 base rate be approved for use on a permanent basis, thus making a refund unnecessary. The PSC fully reviewed the recommended decision and, in its order dated March 13, 1992, reduced the base rate Central could charge to $27.45 per ton or $30.20 per ton including assessments.

On June 6, 1991, Central filed an application to increase its rates at the Braxton County landfill to $50.00 per ton, including all assessments.[2] This application was assigned Case No. 91–400–SWF–42A. In a decision dated April 9, 1992, the ALJ determined that the rate established in Case No. 89–405–SWF–T should be used as a floor upon which cost increases should be added because he found the same test year was used in establishing the proper rate in both proceedings. He recommended that the rate per ton be increased to $37.64. Both the staff and Central filed exceptions to this recommended order. Once again, the PSC refused to adopt the ALJ's decision and, instead, ordered Central to charge a base rate of $21.58 per ton plus assessments. Central appeals this order pursuant to W.Va.Code, 24A–8–1.[3]

## II.

■ Over a decade ago, in *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), we discussed at great length the standard of review this Court will apply in an appeal of an order of the PSC. We adopted a comprehensive standard from a test established by the Unit-

ed States Supreme Court in *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). We incorporated this standard into Syllabus Point 2 of *Monongahela Power:*

"In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors."

*See, e.g., Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n,* 171 W.Va. 494, 300 S.E.2d 607 (1982).

In *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 171 W.Va. at 498, 300 S.E.2d at 611, we summarized the detailed standard for our review of an order of the PSC contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission, supra:*

"(1) [W]hether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper."

2. See W.Va.Code, 24–2–4a (1986), for the procedure a public utility must follow when requesting a rate change.

3. W.Va.Code, 24A–8–1, provides, in part:
   "Any party feeling aggrieved by the entry of a final order by the [PSC], affecting him or it,

may present a petition in writing to the supreme court of appeals, or to a judge thereof in vacation, within thirty days after the entry of such order, praying for the suspension of such final order."

## III.

Central is not arguing that, as a result of the PSC's actions, it cannot maintain its financial integrity, attract necessary capital, or fairly compensate its investors for the risks they have assumed. Rather, it argues that the PSC abused its statutory power when it failed to follow its earlier decision and that there was insufficient evidence to support several of the PSC's findings.

Central's main argument is that because the staff used the same test year, field information, and audit information in both Case No. 89–405–SWF–T and Case No. 91–400–SWF–42A, the ALJ did not err when he used the rate established in Case No. 89–405–SWF–T as a floor upon which an upward adjustment should be made in Case No. 91–400–SWF–42A. Specifically, Central contends that because no one appealed the order in Case No. 89–405–SWF–T, it was a final order that the PSC had already determined was reasonable; thus, the findings in the first case are entitled to a preclusive effect.

The PSC responds that although the test year used by staff in Case No. 89–405–SWF–T was a starting point in reaching a proper rate in this case, staff did conduct additional financial investigations and filed a separate report. Furthermore, the PSC argues that because the rates established in both proceedings must be reached independently of each other, it is not bound by findings of facts in earlier proceedings. Finally, the PSC maintains that the doctrine of stare decisis does not apply to administrative proceedings.

## A.

■ In essence, Central is contending that the PSC abused or exceeded its legitimate authority under W.Va.Code 24–2–1, *et seq.*, by not adhering to its earlier ruling in Case No. 89–405–SWF–T. The PSC's general powers concerning the establishment of rates for public utilities are found in W.Va.Code, 24–2–3 (1983), which states, in pertinent part:

"The [PSC] shall have the power to enforce, originate, establish, change and promulgate tariffs, rates, joint rates, tolls and schedules for all public utilities. . . . *And*

*whenever the [PSC] shall, after hearing, find any existing rates . . . unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the [PSC] shall by an order fix reasonable rates . . . to be followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any provisions of law* [.]" (Emphasis added).

Our reading of W.Va.Code, 24–2–3, leads us to conclude that inquiry beyond the provision's own language is unnecessary. We find this statute clearly and unambiguously gives the PSC the power to reduce or increase rates whenever it finds that the existing rate is "unjust, unreasonable, insufficient, or unjustly discriminatory or otherwise in violation of any provisions of [chapter 24]." There is no language in the statute that requires the PSC to adhere to factual findings or legal positions it may have adopted in an earlier rate case involving the same party.

■ Accordingly, we are compelled to apply our traditional rule of statutory construction found in Syllabus Point 1 of *State ex rel. Board of Trustees v. City of Bluefield*, 153 W.Va. 210, 168 S.E.2d 525 (1969):

" 'When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such a case it is the duty of the courts not to construe but to apply the statute.' Point 1, syllabus, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369 [135 S.E.2d 262 (1964)]."

*See also West Virginia Radiologic Technology Bd. of Examiners v. Darby*, 189 W.Va. 52, 427 SE.2d 486 (1993); *Pugh v. Workers' Compensation Comm'r*, 188 W.Va. 414, 424 S.E.2d 759 (1992); *Sly v. Sly*, 187 W.Va. 172, 416 S.E.2d 486 (1992). When applying this standard, we find that the PSC did not exceed its statutory authority granted under W.Va.Code, 24–2–3, when it changed the rate Central could charge in Case No. 91–400–SWF–42A.

### B.

Even if W.Va.Code, 24–2–3, did not give the PSC broad authority to review and change rates it had previously set, the doctrine of stare decisis does not generally apply to regulatory decisions by administrative agencies. We recognized this general principle in *Chesapeake & Potomac Telephone Co. v. Public Service Commission*, 171 W.Va. at 500, 300 S.E.2d at 613:

> " 'When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of the past decisions.... Even when conditions remain the same, the administrative understandings of those conditions may change, and the agency must be free to act....' 2 K. Davis, *Administrative Law* § 18.09 (1958) (footnotes omitted.)"

*See also Ex Parte Shelby Med. Center, Inc.*, 564 So.2d 63 (Ala.1990); *Motor Cargo v. Public Serv. Comm'n*, 108 Nev. 335, 830 P.2d 1328 (1992); *Standard Fire Ins. Co. v. Insurance Dep't*, 148 Pa.Commw. 350, 611 A.2d 356 (1992); *Courtesy Motors, Inc., v. Ford Motor Co.*, 9 Va.App. 102, 384 S.E.2d 118 (1989); *Wisconsin Power & Light Co. v. Public Serv. Comm'n*, 148 Wis.2d 881, 437 N.W.2d 888 (App.1989). Thus, we concluded in Syllabus Point 5 of *Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra:* "The doctrine of *stare decisis* does not normally apply to administrative decisions."

The foregoing Syllabus is perhaps overly broad as stare decisis may apply to some agency rulings. Moreover, the term "stare decisis" is not often used in administrative law, rather the term "res judicata appears to be preferred.[4] Thus, when speaking to the question of what type of decisions may be

binding upon an agency, this summary is found in 2 Am.Jur.2d *Administrative Law* § 497 at 307 (1962):

> "[T]he answer given by the courts to the question whether an administrative determination is capable of being res judicata depends upon the nature of the administrative action involved, and the doctrine of res judicata has been applied to administrative action that has been characterized by the courts as 'adjudicatory,' 'judicial,' or 'quasi-judicial,' while to administrative determinations of 'administrative,' 'executive,' 'legislative,' or 'ministerial' nature the rules of res judicata have been held to be inapplicable." (Footnote omitted).

We held in Syllabus Point 3 of *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 359 S.E.2d 124 (1987), that res judicata may apply to an administrative agency if the following conditions are met:

> "An assessment of three factors is ordinarily made in determining whether res judicata and collateral estoppel may be applied to a hearing body: (1) whether the body acts in a judicial capacity; (2) whether the parties were afforded a full and fair opportunity to litigate the matters in dispute; and (3) whether applying the doctrines is consistent with the express or implied policy in the legislation which created the body."

*See also Rowan v. McKnight*, 184 W.Va. 763, 403 S.E.2d 780 (1991); *Liller v. West Virginia Human Rights Comm'n*, 180 W.Va. 433, 376 S.E.2d 639 (1988).

In *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936), the United States Supreme Court held that rate-making authority is a legislative function. In exercising "its rate-making authority, the legislature has a broad discretion. It may exercise that authority

---

4. The principles of stare decisis and res judicata are very similar under the facts presented here. The doctrine of stare decisis is that once a court has "laid down a principle of law as applicable to a certain state of facts, it will adhere to that principle and apply it to all future cases, where [the] facts are substantially the same[.]" *Black's Law Dictionary* 1261 (5th ed. 1979). *See, e.g., In re Proposal To Incorporate Town of Chesapeake*, 130 W.Va. 527, 45 S.E.2d 113 (1947); *Janasie-*

*wicz v. Board of Educ.*, 171 W.Va. 423, 299 S.E.2d 34 (1982). Res judicata is the rule that "a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action." *Black's Law Dictionary* at 1174. *See Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983).

directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards." 298 U.S. at 50, 56 S.Ct. at 725, 80 L.Ed. at 1040–41. Our Legislature chose to exercise its rate-making authority through the PSC. *See* W.Va.Code, 24–1–1(a) (1986).[5] The United States Supreme Court in *Tagg Brothers & Moorhead v. United States,* 280 U.S. 420, 445, 50 S.Ct. 220, 226, 74 L.Ed. 524, 537 (1930), stated: "A rate order is not *res judicata.* Every rate order may be superseded by another." *See also United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Norfolk & W. Ry. Co. v. United States,* 768 F.2d 373 (D.C.Cir.1985), *cert. denied sub nom., Aluminum Ass'n, Inc. v. Norfolk & W. Ry. Co.,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *New England Rehabilitation Hosp. of Hartford, Inc. v. Commission on Hosp. of Health Care,* 226 Conn. 105, 627 A.2d 1257 (1993); *Indiana Gas Co. v. Office of Util. Consumer Counselor,* 610 N.E.2d 865 (Ind. App.1993).

We, therefore, conclude that when the PSC is exercising its rate-making authority under W.Va.Code, 24–2–3, its decisions are not subject to the doctrines of stare decisis or res judicata simply because rate making is a legislative function. Thus, the PSC's rate order in Case No. 89–405–SWF–T did not preclude it from subsequently reducing the rate Central could charge in Case No. 91–400–SWF–42A.[6]

### IV.

■ Finally, Central contends that the PSC erred when it refused to factor into the base rate the cost of constructing a clay liner under the landfill disposal area and approximately $72,295 in operating and maintenance expenses. We have reviewed the record and find these assignments of error to be without merit. As we stated in Syllabus Point 5 of *Boggs v. Public Service Commission,* 154 W.Va. 146, 174 S.E.2d 331 (1970):

> " 'The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. Public Service Commission,* 143 W.Va. 33 [99 S.E.2d 1 (1957) ]."

*See also Braxton County Citizens v. Public Serv. Comm'n,* 189 W.Va. 249, 429 S.E.2d 899 (1993); *Capitol Radiotelephone Co. v. Public Serv. Comm'n,* 185 W.Va. 39, 404 S.E.2d 528 (1991).

■ Although our decision in *Monongahela Power Co. v. Public Service Commission, supra,* adopted the *Permian Basin* analysis after our decision in *Boggs,* that standard of review "did not supplant, but rather incorporated, the previous standards enunciated by this Court regarding the sufficiency of the Commission's findings and the methods of regulations it employs." *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n,* 171 W.Va. at 498, 300 S.E.2d at 611. (Citation omitted). In other words, "in deference to the Commission's expertise, . . . this Court will not substitute our judgment for that of the Commission on controverted evidence." 171 W.Va. at 498, 300 S.E.2d at 611. (Citations omitted). Finally, in Syllabus Point 4 of *Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra,* we recognized that the burden was on a public utility to justify a rate increase:

> "Under the provisions of W.Va.Code § 24–2–4a (1980 Replacement Vol.) a public utility seeking an increase in rates and charges has the burden of showing that

---

5. W.Va.Code, 24–1–1(a), states, in part: "It is the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities[.]"

6. Moreover, even though Central argues that the same information was used in determining the

rates in both cases, the PSC specifically found that this allegation was not true. The PSC found that the same test year was used as a starting point in Case No. 91–400–SWF–42A, but that "[s]taff also conducted substantial subsequent financial investigations and filed a separate report in this proceeding."

the proposed increase is just and reasonable."

*See also* Syllabus Point 2, *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n,* 171 W.Va. 708, 301 S.E.2d 798 (1983).

Central argues that the PSC erred in refusing to include the $85,000 cost for a four-foot clay liner under the landfill disposal area. Unfortunately, Central failed to produce any evidence regarding the actual thickness of the liner. Indeed, Central's own witness, Ashok M. Sanghavi, a sanitary engineer who was employed by Central, admitted that he never tested the depth of the liner or knew anyone who had. Moreover, Central failed to produce any documentation that it actually incurred costs of $85,000 in constructing the liner. On the other hand, Warren Knotts, a geologist with the Division of Natural Resources, testified that he could only verify that there was a two-foot layer of soil as a liner. After reviewing this evidence, the PSC found the requisite evidence was not produced and that the ALJ erred in placing the burden on the PSC's staff.[7]

Because Central did not meet the burden of proving that such expenditure was made or that, if made, was a prudent expenditure for value received, the PSC excluded this amount when ascertaining the appropriate base rate. When applying the standard we enunciated in Syllabus point 5 of *Boggs v. Public Service Commission, supra,* we believe this finding is not contrary to the evidence or arbitrary.

We reach a similar conclusion with regard to Central's assertion that the PSC erroneously excluded from the equation during computation of the base rate, the $72,000 necessary to cover the cost of maintaining equipment Central had rented from its parent company. The PSC found these expenses should be adequately covered under the $182,009 charged as an overall operation expense of the landfill and should not consti-

tute a separate expense. We find this ruling is not arbitrary or contrary to the evidence.

## V.

For the reasons outlined above, we affirm the final order of the PSC.

Affirmed.

---

7. The PSC explained:

"Whenever Staff, or any party to a rate case, questions an expenditure, the burden of proving that the expenditure was actually made must fall upon the utility. With regard to this issue, Staff attempted to find documentation of capital expenditures for a four foot compacted clay liner and could find none. Rather than require such documentation from the Applicant before allowing the inclusion of the claimed $85,000 expenditure in rate base, the ALJ appears to place the burden of producing documentation of a lower expenditure upon Staff."