534 S.E.2d 40

**MINGO COUNTY REDEVELOPMENT AUTHORITY, Plaintiff Below, Appellee,**

v.

**James GREEN, Sr., Single; James Green, Jr., Single; Sidney Green, Single; Alvin Green, Single; Harvey Green, Single; Connie Green, Single; and Patricia Green, Single, Defendants Below,**

**Glen B. Gainer, III, Auditor and Commissioner of Delinquent and Non–Entered Lands for the State of West Virginia, Defendant Below, Appellant,**

and

**Stephen C. Sluss, Deputy Commissioner of Delinquent and Non–Entered Lands for Mingo County, Defendant Below, Appellant,**

and

**Maggie Harmon, and Matewan Bank, and Sheriff of Mingo County, West Virginia, and State of West Virginia, and Unknown Heirs, Defendants Below.**

No. 26601.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2000.

Decided July 10, 2000.

Dissenting Opinion of Chief Justice Maynard July 14, 2000.

---

George C. Howell, Esq., Ashland, Kentucky, Attorney for Appellee.

Barbara Harmon–Schamberger, Esq., Charleston, West Virginia, Attorney for Appellants Gainer and Sluss.

PER CURIAM:

In this case, the Auditor of the State of West Virginia, the Honorable Glen B. Gainer, III, and the Mingo County Redevelopment Authority (the "Redevelopment Authority") both claim the right to dispose of the same piece of property. The Auditor argues that he followed the law and, through his agents, made a valid and enforceable "tax-sale"[1] of the property to a new owner. The Redevelopment Authority argues that it had instituted valid condemnation proceedings against the same property and that the Auditor should not have been permitted to conduct the tax-sale.

The Circuit Court of Mingo County concurred with the Redevelopment Authority, and in an order dated August 25, 1998, voided the deed granted by the Auditor, granted the tax-sale purchaser a refund, and implicitly granted ownership of the property to the Redevelopment Authority. Subsequently, the Auditor appealed this decision. Because we find that the Auditor complied with the notice requirements of W. Va.Code § 11A–3–1, et seq., we find that the tax-sale was valid, and for the reasons set forth below, reverse.

## I.

## BACKGROUND

This case involves the collision of a condemnation action and a so-called tax-sale of land on which the taxes were delinquent. Irene Green owned an interest in property on Mate Creek, near Red Jacket in Mingo County. In 1992, Irene Green died intestate, leaving several heirs.[2] For reasons unknown, none of the Green heirs paid the property tax for several years. This failure to pay the tax on Mrs. Green's real property initiated a statutorily-required process whereby the land eventually would be sold for payment of the taxes.[3]

As this tax-sale process advanced, the property came to the attention of the Mingo County Redevelopment Authority. The Redevelopment Authority decided that it would like to acquire the late Mrs. Green's property to use the land to develop a housing project. The Redevelopment Authority is an entity created by the County Commission of Mingo County pursuant to W. Va.Code § 16–18–1, et seq., and charged with the duty of ameliorating slum and blight in the county.[4]

The Redevelopment Authority filed a condemnation proceeding against the property on November 20, 1995.[5] Although the Redevelopment Authority served this complaint upon the Mingo County Sheriff's office, counsel for the Redevelopment Authority did not file a notice of lis pendens with the county clerk, which would have put any potential purchasers on notice of the condemnation action.[6]

The Redevelopment Authority named the State of West Virginia in the complaint, ap-

1. We use the term "tax-sale" as shorthand for the entire process whereby a sheriff or the Auditor sells at auction a property on which no one has paid the real property taxes. As we discuss with greater particularity, infra, there are actually two kinds of "tax-sales." First, the sheriff of a county tries to sell the property at auction. If no one buys at the sheriff's sale, after a certain time, the Auditor conducts a second sale. The property in this case was finally sold at the Auditor's sale.

2. Irene Green's heirs were James Green, Sr., James Green, Jr., Alvin Green, Harvey Green, Connie Green, and Patricia Green, to whom we shall refer as the "Green heirs."

3. The record indicates that no taxes were paid after 1992, but is unclear as to how many years the taxes went unpaid.

4. "Urban Renewal Authorities" or county or regional "Redevelopment Authorities," though similar in organization and function, should not be considered identical to "County Development Authorities," which are governed by W. Va.Code § 7–12–1 et seq., and have their own powers, duties, and limitations.

5. The record does not reveal whether the Redevelopment Authority obtained a writ of entry for the property.

6. It would have been appropriate for the Redevelopment Authority to have filed a notice of lis pendens in this case, as its suit concerned the ownership of the real estate in question. "A notice of lis pendens is properly filed pursuant to W. Va.Code § 55–11–2 (1981) only when a person seeks 'to enforce any lien upon, right to, or

parently in an effort to discover any claim the State might have had on the Green property. The Department of Tax and Revenue replied by letter dated January 16, 1996, that the State had no liens upon the property, but that the Mingo County Sheriff had a lien upon the property for unpaid property taxes.[7]

In spite of, or perhaps because of, the ongoing dealings between the Green heirs and the Redevelopment Authority, no one had paid the taxes since sometime in 1992. At some point, the Sheriff of Mingo County (the "Sheriff") offered the property for sale at auction.[8] No one purchased the property at the Sheriff's sale, so pursuant to W. Va. Code § 11A–3–8 (1994), the Sheriff then "certified" the property to the Auditor of the State of West Virginia.[9]

Both procedures, the condemnation and the tax-sale, continued. In July 1996, counsel for the Redevelopment Authority contacted an employee of the Auditor's office. On August 16, 1996, that same employee of the Auditor's office faxed to counsel for the Redevelopment Authority a detailed description of the taxes and fees then owing on the property. However, for reasons unknown, neither the Green heirs nor the Redevelopment Authority ever paid the taxes. Some eight months later, the Auditor's agent, Deputy Commissioner of Delinquent and Nonentered Lands Stephen C. Sluss,[10] sold the property at auction on April 23, 1997. At the auction, one Vida Maynard[11] purchased the property from the Auditor. However, there was still time at this point for the owner to redeem the property by paying the accumulated taxes and fees. As required by statute, the Auditor's office notified the Green heirs of the sale, and of the amount they would have to pay to redeem the property before the Auditor issued a deed to the purchaser.

Meanwhile, back at the Mingo County Courthouse, the condemnation process had gathered speed, and on September 15, the Circuit Court of Mingo County entered an order approving the payment of $10,500 by the Redevelopment Authority into court (later to be paid to the Green heirs) and granting the Redevelopment Authority "immediate possession" of the property. Still, neither the Green heirs nor the Redevelopment Authority paid the required sums to the Auditor. The tax-sale process and the condemnation process finally collided on October 1, 1997, when Deputy Commissioner Sluss conveyed, at the request of the purchaser Ms. Maynard, a quitclaim deed to the Green property to one Maggie Harmon.[12]

Within the context of its already pending condemnation action, the Redevelopment Authority moved the Circuit Court of Mingo County to set aside the deed to Ms. Harmon. The court then requested the Auditor to appear, so that the court could resolve the question of ownership. After some delay, the Redevelopment Authority finally served

interest in designated real estate.' " Syl. Pt. 1, *State ex rel. Watson v. White,* 185 W.Va. 487, 408 S.E.2d 66 (1991).

**7.** The Department of Tax and Revenue is connected with the Governor's office, and is not a part of the Auditor's office.

**8.** The record does not indicate when the Sheriff conducted this sale. As we discuss below, the record suggests that this sale may have occurred well before the Redevelopment Authority commenced its condemnation action.

**9.** If a sheriff is unable to sell the property at auction to recover the delinquent taxes, the sheriff "certifies" the property to the office of the Auditor. In plain language, this means that the sheriff conveys all of the pertinent information regarding the property to the Auditor so that the Auditor may attempt a second auction sale pursuant to statute. W. Va.Code §§ 11A–3–8, 11A–

3–44, *et seq.* Before the Legislature revised the statute, the Auditor "took title" to the property, thus terminating the rights of the delinquent owner. We discuss this change in the law in greater detail, *infra.*

**10.** One of the duties of the Auditor of the State of West Virginia is to act as "Commissioner of Delinquent and Nonentered Lands." W. Va. Code § 11A–3–33 (1994). Pursuant to W. Va. Code § 11A–3–34 (1994), the Auditor may appoint deputies to conduct auctions to sell such lands in an effort to recover delinquent taxes.

**11.** No known relation to Chief Justice Maynard.

**12.** Although Vida Maynard purchased the property at the Deputy Commission's sale by paying the accumulated taxes and fees, she asked Deputy Commissioner Sluss to convey her interest in property to Maggie Harmon, adding yet another, minor complication to the facts of this case.

the Auditor with a copy of the complaint in the condemnation action and the judge conducted hearings on November 24, 1997 and May 18, 1998.[13]

After the hearings and examining briefs from the Redevelopment Authority and the Auditor, Judge Thornsbury determined that the Auditor should have provided the Redevelopment Authority with notice of the sale. Thereafter, the court issued an order granting the Redevelopment Authority's Motion to Set Aside on August 25, 1998, in which it voided the deed conveyed by the Auditor to Ms. Harmon, ordered any consideration paid at the tax-sale to be returned to the buyer, and thus upheld its earlier grant of possession of the Green property to the Redevelopment Authority.[14]

The Auditor appealed the decision to this Court, and argues that he, the Auditor, or his agents followed the statutorily mandated procedure for the tax-sale, and that the tax-sale deed conveyed to Ms. Harmon was valid. However, for reasons not clear to the Court,[15] the Auditor requests that this Court validate his adherence to the procedure, but still set aside the deed to Ms. Harmon, order her consideration returned, and allow the Redevelopment Authority possession of the property. Because we find that the Auditor fulfilled his obligations under the statute, we hold that the sale by the Auditor must stand.

## II.

### STANDARD OF REVIEW

We are asked to examine the lower court's interpretation of the statute that reg-

ulates tax-sales. In such an examination, our review is *de novo*. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). Furthermore, we have a duty to apply the statute as written when its terms are not ambiguous. " ' "When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such a case it is the duty of the courts not to construe but to apply the statute." Point 1, syllabus, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369 [135 S.E.2d 262 (1964) ].' Syllabus Point 1, *State ex rel. Board of Trustees v. City of Bluefield*, 153 W.Va. 210, 168 S.E.2d 525 (1969)." Syl. pt. 3, *Central West Virginia Refuse, Inc. v. Public Service Com'n of West Virginia*, 190 W.Va. 416, 438 S.E.2d 596 (1993).

## III.

### DISCUSSION

From the record we will attempt to reconstruct the arguments of the parties.[16] The Redevelopment Authority claims that the Auditor and the Sheriff of Mingo County had actual or constructive notice of the Redevelopment Authority's claim to the property. Because of this notice, either the Sheriff or Auditor should have halted the tax-sale

---

**13.** At the May 18, 1998 hearing, James and Sidney Green appeared and alleged that they had paid the taxes, and presented a receipt for a money order. Had the Green heirs actually paid the taxes, this case probably would have turned out differently. However, the record indicates that the judge doubted the authenticity of the receipt, which may have been altered. He granted the Greens five days to obtain proof of payment, which apparently they failed to produce. None of the Green heirs actively participated in this appeal.

**14.** The Redevelopment Authority had already paid into the court approximately $10,500, which was the value of the property, as determined by special commissioners, appointed pursuant to the condemnation process. The Green

heirs were to receive this sum in compensation for the land taken by the Redevelopment Authority.

**15.** The Redevelopment Authority chose not to submit a brief in this matter. Additionally, the Auditor chose to submit the case on briefs, forgoing an opportunity for oral argument. The Green heirs did not participate in the appeal in any fashion. Thus the Court does not have the breadth of information usually available when two or more parties brief and argue a case.

**16.** As noted, the Redevelopment Authority did not submit a brief and neither party chose to appear to argue this case before the Court, thus we rely upon the record and the brief submitted by the Auditor.

process and allowed the Redevelopment Authority to condemn the property, presumably allowing the Redevelopment Authority the opportunity of paying the delinquent taxes at some future time.

As an initial matter, the Auditor argues that, because of the importance of finality in tax-sales, it is imperative that no court overturn a valid sale. To do otherwise would invite a flood of challenges and would create title problems for thousands of buyers who obtained their property through tax-sales.

■ We agree with the Auditor that confidence in one's title to land is of paramount importance. As we have remarked previously, "certainty above all else is the preeminent compelling public policy to be served." *Hock v. City of Morgantown*, 162 W.Va. 853, 856, 253 S.E.2d 386, 388 (1979). We are also mindful that the government must make a timely collection of property taxes in order to function properly. As pointed out by the Legislature:

> In view of the paramount necessity of providing regular tax income for the state,

county and municipal governments, particularly for school purposes; and in view of the further fact that delinquent land not only constitutes a public liability, but also represents a failure on the part of delinquent private owners to bear a fair share of the costs of government, . . .

W. Va.Code § 11A–3–1(1994).[17]

We group the Auditor's assignments of error into two categories for the purposes of this opinion: (1) that the lower court made demands of the Auditor that are not required by the statute, and (2) that the lower court improperly equated phone calls, letters, and communications with another arm of state government with notice to the Auditor sufficient to trigger new obligations under the statute.[18]

■ First we recognize that this area of the law has undergone significant change in the last several years, with each change increasing the protections afforded the delinquent land owner. As we noted in *Lilly v. Duke*, 180 W.Va. 228, 376 S.E.2d 122, (1988),

**17.** The entire section reads:

> In view of the paramount necessity of providing regular tax income for the state, county and municipal governments, particularly for school purposes; and in view of the further fact that delinquent land not only constitutes a public liability, but also represents a failure on the part of delinquent private owners to bear a fair share of the costs of government; and in view of the rights of owners of real property to adequate notice and an opportunity for redemption before they are divested of their interests in real property for failure to pay taxes or have their property entered on the land books; and in view of the fact that the circuit court suits heretofore provided prior to deputy commissioners' sales are unnecessary and a burden on the judiciary of the state; and in view of the necessity to continue the mechanism for the disposition of escheated and waste and unappropriated lands; now therefore, the Legislature declares that its purposes in the enactment of this article are as follows: (1) To provide for the speedy and expeditious enforcement of the tax claims of the state and its subdivisions; (2) to provide for the transfer of delinquent and nonentered lands to those more responsible to, or better able to bear, the duties of citizenship than were the former owners; (3) to secure adequate notice to owners of delinquent and nonentered property of the pending issuance of a tax deed; (4) to permit deputy commissioners of delinquent and nonentered lands to sell such lands without the

necessity of proceedings in the circuit courts; (5) to reduce the expense and burden on the state and its subdivisions of tax sales so that such sales may be conducted in an efficient manner while respecting the due process rights of owners of real property; and (6) to provide for the disposition of escheated and waste and unappropriated lands.

W.Va.Code § 11A–3–1(1994)

**18.** Specifically, the Auditor contends that the lower court erred by applying the duties of the Sheriff to the Auditor, by applying to the Auditor a notice requirement actually belonging to the purchaser of a property, by finding that a phone call and a letter constituted proper notice to the Auditor of the Redevelopment Authority's interest, by finding that the Auditor's agents should have provided personal notice of the sale to the Redevelopment Authority, by finding that notice to the Department of Tax and Revenue also constituted notice to the Auditor of the Redevelopment Authority's interest in the property, and by holding that the wrong party should receive a refund, upon the recision of the sale.

We disagree with the Auditor's other assignment of error, that the Redevelopment Authority did not have standing to challenge the sale. We feel that the lower court had discretion to consider this matter, as it already had the pending condemnation action before it, although ordinarily any such suit should be filed on behalf of the former owners.

the U.S. Supreme Court cases of *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), and *Tulsa Prof. Collection Servs. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), forced us to reevaluate earlier versions of the statute we are examining today:

[T]hese cases prescribe certain constitutional due process requirements for notice of a tax sale of real property. Where a party having an interest in the property can reasonably be identified from public records or otherwise, due process requires that such party be provided notice by mail or other means as certain to ensure actual notice, as set out in *Mennonite:*

"Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." 462 U.S. at 800, 103 S.Ct. at 2712, 77 L.Ed.2d at 188. (Emphasis in original).

Thus, we conclude that W. Va.Code, 11A–3–2 (1967), was, prior to its amendments in 1983 and 1985, constitutionally invalid insofar as it permitted the sale of real property without personal notice to affected owners and others having an interest in the property.

*Lilly v. Duke*, 180 W.Va. 228, 231, 376 S.E.2d 122, 125 (1988). The end result of this analysis was a new syllabus point underlining the importance of providing notice to those who have an interest *of record* in property:

There are certain constitutional due process requirements for notice of a tax sale of real property. Where a party having an interest in the property can reasonably be identified from public records or otherwise, due process requires that such party be provided notice by mail or other means as certain to ensure actual notice.

Syl. pt. 1, *Lilly v. Duke*, 180 W.Va. 228, 376 S.E.2d 122 (1988). After this ruling, the Legislature found it necessary to make additional changes to the statute, amending it again effective July 1, 1994. We noted this change in a later case:

We recognize that, in 1994, our legislature amended and reenacted articles 3 and 4, substituting present W. Va.Code, 11A–3–1 to 11A–3–68 for former W. Va.Code, 11A–3–1 to 11A–3–44, concerning sale of land for taxes, and substituting present W. Va. Code, 11A–4–1 to 11A–4–7 for former W. Va.Code, 11A–4–1 to 11A–4–41, concerning sale of lands for school funds....

*Stewart v. SMC Inc.*, 192 W.Va. 441, 447, n. 18, 452 S.E.2d 899, 905 n. 18 (1994). Thus the statute we address today differs substantially from that found lacking in *Lilly, supra.* Bearing the statute's history in mind, we examine the obligations it places upon a sheriff and the Auditor.

### A.

### A Sheriff's Duties Under the Statute

The Legislature has described the process whereby the state may sell property for non-payment of taxes in W. Va.Code § 11A–3–1, *et seq.* (1994). The drafters of this chapter divided it into three parts: Part I [19] explains the duties of a sheriff, Part II [20] sets forth the duties of the Auditor, and Part III [21] deals with several miscellaneous provisions.

The Code requires a sheriff to publish a list of properties on which the taxes are delinquent and to send a "notice of delinquency" to certain parties. Specifically,

(a) On or before the tenth day of September of each year, the sheriff shall prepare a second list of delinquent lands, which shall include all real estate in his county remaining delinquent as of the first day of September, together with a notice of sale, in form or effect as follows: [description of required form omitted]....

The sheriff shall publish the list and notice prior to the sale date fixed in the notice as a Class III–0 legal advertisement in compliance with the provisions of article three, chapter fifty-nine of this code, and

---

**19.** W. Va.Code §§ 11A–3–1 through 32.

**20.** W. Va.Code §§ 11A–3–33 through 66.

**21.** W. Va.Code §§ 11A–3–66 to end.

the publication area for such publication shall be the county.

(b) In addition to such publication, no less than thirty days prior to the sale the sheriff shall send a notice of such delinquency and the date of sale by certified mail: (1) To the last known address of each person listed in the land books whose taxes are delinquent; (2) to each person having a lien on real property upon which the taxes are due as disclosed by a statement filed with the sheriff pursuant to the provisions of section three of this article; (3) to each other person with an interest in the property or with a fiduciary relationship to a person with an interest in the property who has in writing delivered to the sheriff on a form prescribed by the tax commissioner a request for such notice of delinquency; and (4) in the case of property which includes a mineral interest [which does not apply in this case]. . . .

W. Va.Code § 11A–3–2 (1995).[22]

Essentially a sheriff must publish a notice in the paper, and must mail a notice to parties with an interest *of record,* or to parties who have, *in the prescribed manner* notified the sheriff of their interest in a given property. As we discuss below, these obligations of a *sheriff* do not apply to the *Auditor,* who has his own statutory obligations. Also, nothing in the record suggests that the Redevelopment Authority complied with any of the conditions of W. Va.Code § 11A–3–2 (1995), quoted above. Although the Redevelopment Authority did serve the Sheriff with a copy of the original complaint from the condemnation action (and the record sug-gests that this may have been filed after the attempted sale had already occurred)[23] there is no evidence that the Redevelopment Authority attempted to use the statutorily mandated methods of providing notice to the Sheriff of its alleged interest in the Green Property. We agree with the Auditor that the lower court erred in applying the requirements of W. Va.Code § 11A–3–2 (1995) to the Auditor or his agents.

While we in no way intend to weaken the due process protections provided by *Lilly v. Duke, supra,* we note that, in addition to the fact that the Authority did not follow the statute and provide proper notice to the Sheriff, in this particular case the Redevelopment Authority was not prejudiced by any lack of notice of the *sheriff's* sale. Indeed, the Sheriff never sold the property, but rather "certified" it to the Auditor. Moreover, as the lower court's order points out, the Redevelopment Authority had several communications with the Auditors's office that revealed: that the taxes were delinquent, that the property was potentially subject to a sale by the Auditor, and that by paying a certain amount by a certain date any liens could easily be removed. It is obvious that responsible persons acting on behalf of the Redevelopment Authority had actual notice of the status of the proceeding to collect delinquent taxes on the property.

## B.

### The Auditor's Duties Under the Statute

■ In addition to his constitutional duties, the State Auditor "shall ex officio be

---

22. We do not address the Code sections that set forth the duties of a purchaser at a "sheriff's-sale" as the Sheriff was unable to sell the property in this case.

23. The record does not reveal the date of the Sheriff's sale. One document suggests that the property was "sold" in 1992, and another notes that the taxes were delinquent from 1992 until 1997. In any event, the normal process of collecting property taxes, as revealed by the code sections we cite in this opinion, is that taxes, though they begin to accrue on the first of January, are not "due" until July 1. The taxes for a given year, such as 1993, would be due July 1, 1993, but would not actually be delinquent until April 30, 1994. The Sheriff would not conduct a sale until October or November of that year, and, if the property did not sell and was certified to the Auditor, the Auditor could not have sold the property for an additional 18 months.

Thus, even if we presume that the Green heirs paid the 1992 taxes in 1992, and it was the 1993 taxes that became delinquent, then the Sheriff's attempted sale would have occurred in the fall of 1994, a year before the Redevelopment Authority filed its condemnation complaint. Even if, for reasons unknown, the Sheriff's attempted sale did not take place until the next year, it most likely occurred before the Redevelopment Authority filed its initial complaint on November 20, 1995, and before the Sheriff received service of process on December 13, 1995. In either case, the issue of notice *from the Sheriff* would be moot, as the Sheriff's attempted sale would have been over before the Redevelopment Authority had filed anything.

state commissioner of delinquent and nonentered lands." W. Va.Code § 11A–3–33 (1994).

> The auditor is empowered, and it shall be his duty, through the land department in his office, to administer and carry into execution the laws with reference to such lands. The auditor on behalf of the state shall have power to hold and manage such lands, and to exercise all other powers incident to the powers and duties conferred upon him by this article.

*Id.* In order to carry out these duties, the Auditor appoints "deputy commissioners" to act as his agents. W. Va.Code § 11A–3–34 (1994). Once the sheriff has attempted a sale, any property not purchased at the sale is "certified" to the Auditor, pursuant to W. Va.Code § 11A–3–8 (1994).[24] If no party steps forward to redeem such a property within 18 months after certification, the land may be sold by a deputy commissioner. W. Va.Code § 11A–3–42 (1994).

The Code requires the Auditor to create a list of all such properties and to submit a copy of this list to the county clerk of each county. In so doing, the Auditor "certifies" this list to deputy commissioners in preparation for sale. W. Va.Code § 11A–3–44 (1994). The Code requires the deputy land commissioner to sell the properties on the list at auction.

> Each tract or lot certified to the deputy commissioner pursuant to the preceding section shall be sold by the deputy commissioner at public auction at the courthouse of the county to the highest bidder between the hours of ten in the morning and four in the afternoon on any business working day within one hundred twenty days after the auditor has certified the lands to the deputy commissioner as required by the preceding section.

W. Va.Code § 11A–3–45(a) (1995).

The only notice requirement that applies to the Auditor is contained in the next sec-tion, which requires the Auditor to publish notice of an impending deputy commissioner's sale.

> Once a week for three consecutive weeks prior to the auction required in the preceding section, the deputy commissioner shall publish notice of the auction as a Class III–0 legal advertisement in compliance with the provisions of article three, chapter fifty-nine of this code, and the publication area for such publication shall be the county.

W. Va.Code § 11A–3–46 (1995). After the sale, the deputy commissioner submits a report to the Auditor who then approves of each sale unless he finds a sale not to be "in the best interests of the state," in which case he will disapprove of the sale. W. Va.Code § 11A–3–51 (1995).

The point at which a party has the obligation to mail or deliver personal notice occurs after the deputy land commissioner's sale. Even after a sale, the original owner still has an opportunity to redeem the property by paying the taxes. Once someone has purchased a property at that sale, the new purchaser has an obligation to identify those parties entitled to redeem the property before that new purchaser can receive a deed to the property.

> (a) Within forty-five days following the approval of the sale by the auditor pursuant to section fifty-one of this article, the purchaser, his heirs or assigns, in order to secure a deed for the real estate purchased, shall: (1) Prepare a list of those to be served with notice to redeem and request the deputy commissioner to prepare and serve the notice as provided in sections fifty-four and fifty-five of this article; and (2) deposit, or offer to deposit, with the deputy commissioner a sum sufficient to cover the costs of preparing and serving the notice.

W. Va.Code § 11A–3–52(a) (1995). The deputy land commissioner then takes the purchaser's list and mails a notice prepared in

---

24. Prior to the changes made by the Legislature in 1994 the State actually "purchased" the property if not sold at the tax sale, and title to the land passed to the State, essentially stripping the former owner of his or her interest at that point in the process. Because of the due process prob-lems inherent in such a scheme, now a sheriff is said to "certify" the property to the Auditor, but title still rests with the (soon-to-be-former) owner until the deputy land commissioner conveys a deed at the end of the tax-sale process. W. Va.Code § 11A–3–8 (1994).

accordance with W. Va.Code § 11A–3–55 (1995) to every person on the list. In the event that no one comes forward to redeem the property before the deadline given in the notice, the deputy commissioner conveys a deed for the property to the new purchaser pursuant to W. Va.Code § 11A–3–59 (1995). Nothing in the record suggests that Auditor Gainer or Deputy Commissioner Sluss failed to comply with any of these requirements.

Essentially, the only way that the Redevelopment Authority may successfully challenge the conveyance of the deed to the new purchaser is to show that the Redevelopment Authority should have been on the list prepared pursuant to W. Va.Code § 11A–3–52 (1995) of "those to be served with notice to redeem." However, the record reflects that, as of the time of the deputy land commissioners sale, the Redevelopment Authority had not given constructive notice of its standing by filing a *lis pendens,* nor had it served the Auditor or Deputy Commissioner Sluss with the complaint in its condemnation action.

The Redevelopment Authority made the argument below, and the judge agreed, that either the phone calls and letters exchanged between counsel for the Authority and an employee of the Auditor's office, or the communications between the Authority and the State Department of Tax and Revenue were sufficient, *in lieu of* proper notice to the Auditor or proper recordation of the pending action. We are not persuaded by this argument.

It is true that counsel for the Redevelopment Authority called the Auditor's office and spoke with an employee about the Green property. It is true that the employee then faxed to the Redevelopment Authority a document showing the taxes and fees due on the property. But we cannot equate this interaction with filing proper notice in the courthouse or properly serving the Auditor with a complaint in the condemnation action. While this might have been, and probably was, sufficient to give the *Authority* actual knowledge of the pendency of the tax collection process, it was not sufficient to convert the Authority into an entity entitled to service of formal notice under the statute.

A purchaser of the property at the Auditor's sale is required to assemble a list of parties who hold some interest in the property. The purchaser must make a diligent search of public records to identify interested parties. If we allow a call to the office to equal notice, then we place upon the Auditor (and presumably every sheriff) the near impossible burden of creating a duplicate system of recordation of property interests for "people who called in," which the purchaser would also have to search to find additional interested parties. This we will not do.

Nor are we in agreement that the Redevelopment Authority's communications with the Department of Tax and Revenue constituted any sort of notice to the Auditor. As the Department correctly informed counsel for the Redevelopment Authority, there is no direct or departmental connection between the offices. We are not inclined to find that communicating with the Department of Tax and Revenue is the legal or practical equivalent of service of notice on the Auditor, or can in any way affect the Auditor's sale of the property.

In sum, we are not sympathetic to the Redevelopment Authority's arguments; the Redevelopment Authority did not properly record its interest in the clerk's office; it did not follow the proper procedures to provide the Sheriff with notice of its interest; it did not serve the Auditor or his Deputy Commissioner with the complaint in the condemnation action, and, perhaps most significantly, it did not pay the taxes, or arrange with the Green heirs to pay the taxes, even though it had actual knowledge that the property was delinquent and subject to sale by the Auditor almost a year before the property was sold at auction.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Mingo County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

**496**

MAYNARD, Chief Justice, dissenting:

(Filed July 14, 2000)

I dissent because I believe the circuit court was correct in voiding the deed granted by the Auditor and granting ownership of the property to the Redevelopment Authority.

The majority bases its decision on the fact that the Auditor complied with the notice requirements of W.Va.Code § 11A–3–1, *et seq.*, but disregards the fact that the Redevelopment Authority properly exercised its authority[1] to acquire the property by eminent domain. The record shows that the Redevelopment Authority filed a condemnation proceeding against the property on November 20, 1995 and named the State of West Virginia in the complaint in an effort to discover any claim the State might have had on the property. On September 15, 1997, the circuit court entered an order approving the payment of $10,500 into court by the Redevelopment Authority and granting the Redevelopment Authority immediate possession of the property.

The Redevelopment Authority was not required to pay the accumulated taxes to the Auditor. "The property of an authority is declared to be public property used for essential public and governmental purposes and such property and an authority shall be exempt from all taxes of the municipality, the county, the State or any political subdivision thereof[.]" W.Va.Code § 16–18–15(b) (1951). Also, no execution or other judicial process shall issue against an authority's property. W.Va.Code § 16–18–15(a). Therefore, after the Redevelopment Authority acquired the property in September 1997, the property was exempt from taxation, subjection to a tax sale, or other judicial process. Although the tax sale of the property occurred in April 1997, the deputy commissioner was required, at that point, to submit a report to the Auditor who then approves the sale unless he finds a sale not to be "in the best interest of the state," in which case he will disapprove of the sale. W.Va.Code § 11A–3–51 (1995). This tax sale process did not terminate until the deputy commissioner conveyed the property to Maggie Harmon on October 1, 1997.

However, at that point, the Redevelopment Authority had acquired ownership of the property. As a result, the deputy commissioner lacked the authority to convey the property to another party.

For this reason, the circuit court was correct to grant ownership of the property to the Redevelopment Authority. Accordingly, I dissent.

---

1. The Redevelopment Authority's power to act is found in W.Va.Code § 16–18–8 (1951).