IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0863
_____

SIERRA CLUB,
Petitioner

v.

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, and
AMERICAN BITUMINOUS POWER PARTNERS, L.P.,
Respondents

_____

Appeal from West Virginia Public Service Commission
Case No. 17-0631-E-P

AFFIRMED
_____

Submitted: February 5, 2019
Filed: April 22, 2019

**FILED**
**April 22, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Evan D. Johns, Esq.
Appalachian Mountain Advocates
Charlottesville, Virginia
J. Michael Becher, Esq.
Appalachian Mountain Advocates
Charleston, West Virginia
Counsel for the Petitioner

Jessica M. Lane, Esq.
J. Joseph Watkins, Esq.
Charleston, West Virginia
Counsel for the Public Service
Commission

Robert R. Rodecker, Esq.
John R. McGhee, Esq.
Kay Casto & Chaney PLLC
John McCuskey, Esq.
Shuman McCuskey & Slicer PLLC
Charleston, West Virginia
Counsel for American Bituminous Power
Partners, L.P.

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "'The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33 (99 S.E.2d 1)." Syl. Pt. 5, *Boggs v. Pub. Serv. Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970).

2.      "The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper." Syl. Pt. 1, *Cent. W.Va. Refuse, Inc. v. Pub. Serv. Comm'n of W.Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993).

3.      Under West Virginia Code of State Rules § 150-3-12.6 (2018), also known as Rule 12.6 of the Public Service Commission's "Rules for the Government of Electric Utilities," before a traditional electric utility may pass on to its retail customers the rates it is paying to a qualifying facility because of an electric energy purchase agreement, the Commission may require the utility to show the rates are just and reasonable to the utility's customers, in the public interest, and do not exceed the utility's avoided costs. This is permitted regardless of whether the agreement with the qualifying facility was reached voluntarily or was compelled by the Commission.

**HUTCHISON, Justice**:

In this appeal from the Public Service Commission ("the PSC"), we are asked to examine the PSC's interpretation and application of regulations it adopted to give effect to the federal Public Utility Regulatory Policies Act, also called "PURPA." In two orders that are under appeal, the PSC interpreted its PURPA-based regulations as applying to a voluntary agreement between a small power plant and a traditional electric utility, and applied the regulations to find that the agreement, with modification, was just and reasonable to the electric utility's consumers.

We find no error in the PSC's decision and affirm.

## I. Factual and Procedural Background

Respondent American Bituminous Power Partners, L.P. ("AmBit"), operates a small electricity-generating plant in Grant Town, West Virginia. A large traditional electric utility, Monongahela Power Company ("Mon Power"), buys the electricity generated by AmBit. Mon Power feeds the electricity produced by this small plant into its transmission lines and distributes that electricity (along with electricity from its own power plants and other sources) to its retail customers in West Virginia.

This appeal concerns the fee or rate that Mon Power pays to AmBit to buy AmBit's electricity. In 2017, the companies agreed to increase substantially the fee on the condition that the PSC allow Mon Power to pass the entire fee on to its retail customers. As we explain in detail later, AmBit and Mon Power sought approval of a fee based on an

1

avoided capacity cost of $40.00 per megawatt-hour. In two orders entered in 2018, the PSC approved a lesser fee, one based on an avoided capacity cost of $34.25 per megawatt-hour, and said that Mon Power could pass the lesser fee on to its customers. Without the PSC's approval, the avoided capacity cost would have been $27.00 per megawatt-hour pursuant to a 2006 PSC order.

Petitioner Sierra Club disputes the method that the PSC employed to analyze and approve that fee increase. To understand the parties' arguments, we must first examine the historical statutory and regulatory framework behind the construction of AmBit's Grant Town plant.

### A. Public Utility Regulatory Policies Act of 1978 ("PURPA")

Since adoption of the Federal Power Act of 1935, the Federal government has exercised "the exclusive authority to regulate 'public utilities' that sell electric power at wholesale in interstate commerce." *Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs of State of N.J.*, 44 F.3d 1178, 1182 (3rd Cir. 1995) (quoting 16 U.S.C. § 824(e)). Then, in the mid-1970s, the United States faced a "nationwide energy crisis" caused by foreign oil embargoes and shortages of natural gas. *Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 745 (1982). Electric utilities were "plagued with increasing costs and decreasing efficiency in the use of their generating capacities" resulting in adverse impacts on consumers and the national economy. *Id.* at 745-46. Congress thereafter embarked on a comprehensive legislative effort focused on encouraging electric utilities to reduce consumption of oil and natural gas. *Id.*

2

In 1978, Congress modified the Federal Power Act by passing the Public Utility Regulatory Policies Act ("PURPA")[1] to encourage the "conservation of electric energy." 16 U.S.C. § 2601 [1978]. Congress also intended for PURPA to encourage the adoption of alternative energy sources, including small power production facilities[2] and cogeneration facilities.[3] A power plant that meets PURPA definitions is called a "qualifying facility."[4] The parties agree that AmBit's Grant Town power plant is a qualifying facility under PURPA.

When it adopted PURPA, Congress found that traditional electric utilities (like Mon Power) might be reluctant to buy electricity from qualifying facilities. In response, Congress required the Federal Energy Regulatory Commission ("FERC") to

---

[1] Pub.L. 95-617, 92 Stat. 3117 (Nov. 9, 1978).

[2] 16 U.S.C. § 796 (17)(A) [2005] defines a "small power production facility" as "a facility which is an eligible solar, wind, waste, or geothermal facility" or which "(i) produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof; and (ii) has a power production capacity which, together with any other facilities located at the same site . . . is not greater than 80 megawatts[.]" *See also,* 18 C.F.R. § 292.204 [2010] ("Criteria for qualifying small power production facilities.").

[3] 16 U.S.C. § 796 (18)(A) [2005] defines a "cogeneration facility" as one which produces both electricity and "steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes[.]" *See also*, 18 C.F.R. § 292.205 [2011] ("Criteria for qualifying cogeneration facilities.").

[4] The Federal Energy Regulatory Commission, the PSC, and other courts often abbreviate the term "qualifying facility" as "QF." *See*, *e.g.*, *W. Penn Power Co.*, 71 FERC ¶ 61153, 61495 (May 8, 1995) ("It is up to the States, not this Commission, to determine the specific parameters of individual QF power purchase agreements[.]"). For the ease of the reader, we avoid the use of this abbreviation.

promulgate rules designed to impel traditional electric utilities to connect to and buy from qualifying facilities. *See* 16 U.S.C. § 824a-3(a) [2005] ("[T]o encourage cogeneration and small power production," FERC was to create rules that "require electric utilities to offer to . . . purchase electricity from such facilities.").[5]

Additionally, Congress required FERC to adopt rules aimed at regulating the fees paid by traditional electric utilities to qualifying facilities. Congress provided the following guidelines for the rates that traditional utilities would be required to pay:

> [I]n requiring any electric utility to offer to purchase electric energy from any qualifying cogeneration facility or qualifying small power production facility, the rates for such purchase—
>
> (1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and
>
> (2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

16 U.S.C. § 824a-3(b).

Furthermore, Congress indicated that FERC could not require a traditional electric utility to pay a qualifying facility a fee that "exceeds the incremental cost to the electric utility of alternative electric energy." *Id.* Congress defined "incremental cost" in this way:

> [T]he term "incremental cost of alternative electric energy" means, with respect to electric energy purchased from a

---

[5] When Congress enacted PURPA, the requirements pertaining to qualifying facilities were contained in Section 210 of the Act. While the requirements have since been codified in 16 U.S.C. § 824a-3, many courts and commentators continue to refer to them as Section 210.

4

qualifying cogenerator or qualifying small power producer, the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source.

16 U.S.C.A. § 824a-3(d).

At this point, we introduce a term of art: "avoided costs." The meaning of "avoided costs," as well as the underlying questions of how and when those costs are measured, are the focus of the parties' arguments. FERC substituted the term "avoided costs" in place of the term chosen by Congress ("incremental cost") when it adopted rules to implement PURPA. Accordingly, "incremental" and "avoided" costs are synonymous.[6]

FERC defines "avoided costs" as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6) [1995]. Despite that definition, it remains a nebulous term.

---

[6] *See, e.g., Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 406 (1983) ("[T]he term full 'avoided costs' used in the regulations is the equivalent of the term 'incremental cost of alternative electric energy' used in § 210(d) of PURPA."); *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners L.P.*, 117 F.Supp.2d 211, 217 (N.D.N.Y. 2000) ("The incremental cost described by Congress in PURPA is defined in the accompanying regulations as 'avoided costs,' or those costs which the utility 'avoided' incurring itself by purchasing power from a [qualifying facility]. *See* 18 C.F.R. § 292.101(b)(6).").

We understand "avoided costs" to be all of the costs that a traditional electric utility would incur to generate or buy electricity, if the utility did not instead buy the electricity from the qualifying facility. In other words, avoided costs are expenses a utility escapes by purchasing electricity for resale from a qualifying facility instead of either building and operating a new plant or purchasing electricity from another wholesale supplier. Viewed in the context of this case, "avoided costs" roughly consists of two parts: the long-term capital cost of building a plant, and the daily fuel and operating costs of the foregone plant. "By setting a ceiling of incremental [or avoided] cost on the amount a utility could be forced to pay for a [qualifying facility's] power, Congress intended to encourage cogeneration [and small power facilities] without requiring a utility's ratepayers to subsidize cogenerators [and small power facilities]." *Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 203 (Tex. 1991).

**B. State regulation of PURPA facilities**

The federal government regulates the sale of electric power at wholesale in interstate commerce. The States, however, through agencies like the PSC, regulate the sale of power by traditional utilities to retail customers. Hence, Congress directed state regulatory authorities to adopt rules applying PURPA's requirements to the utilities they regulate, and to drive those utilities to procure electricity from qualifying facilities. "Congress intended that state regulatory authorities be the primary enforcers of PURPA[.]" *Id.*, 809 S.W.2d at 204. Congress provided that, within one year of FERC's adoption of a

6

PURPA rule, "each State regulatory authority shall . . . implement such rule . . . for each electric utility for which it has ratemaking authority."  16 U.S.C. 824a-3(f)(1).

Shortly after passage of PURPA, the West Virginia Legislature directed the PSC to "perform those duties expressly conferred upon a state regulatory authority by the . . . 'Public Utilities Regulatory Policy Act of 1978[.]'"  W.Va. Code § 24-2-13 [1979]. The PSC complied with the legislative mandate and incorporated PURPA's requirements into Rule 12 of its "Rules for the Government of Electric Utilities." *See generally*, W.Va. Code R. § 150-3-12.1 to -12.9.3 [2018].  In accordance with PURPA, the PSC's rules require traditional electric utilities to "purchase . . . any energy and capacity which is made available from a qualifying facility[.]"  W.Va. Code R. § 150-3-12.4.1. The rules also require traditional electric utilities to "make such interconnection with any qualifying facility as may be necessary to accomplish purchases[.]" W.Va. Code R. § 150-3-12.4.3.a.

Regarding the fees that a traditional electric utility pays to a qualifying facility to purchase electricity, Rule 12.6.1 of the PSC's Rules follows FERC's PURPA-based avoided-cost standard and provides:

> 12.6.1.  Rates for purchases -- Rates for purchases shall:
>
> > 12.6.1.a.   Be just and reasonable to the electric consumer and in the public interest, and
> >
> > 12.6.1.b.   Not discriminate against qualifying cogeneration and small power production facilities: however, nothing in this rule shall require an electric utility to pay more than the avoided costs for purchases[.]

W.Va. Code R. § 150-3-12.6.1. Further, the PSC's Rules provide that if the rates paid by the traditional electric utility to the qualifying facility "equal the avoided costs" of the utility, then the rate "satisfies the requirements of Rule 12.6.1." W.Va. Code R. § 150-3-12.6.2.b. Similar to FERC's rules, our PSC defines "avoided costs" in Rule 12 as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." W.Va. Code R. § 150-3-12.1.1.f.

In summary, under PURPA and the PSC's rules, traditional electric utilities (like Mon Power) may be compelled to purchase electricity from nontraditional producers (like AmBit) that operate qualifying facilities. Under PURPA and the PSC's Rule 12.6, and in the context of this case, any fee that the traditional electric utility pays to the qualifying facility must meet these goals: the fee must be just and reasonable to the retail customers of the electric utility; the fee must be in the public interest; and the fee must not exceed the avoided capital and operating costs to the electric utility. Finally, if the fee is equal to the utility's avoided costs, then it is automatically considered to be just and reasonable to customers and in the public interest.

## C. The Grant Town Plant

In 1987, AmBit began planning to build an 80-megawatt power plant in Grant Town. The plant was designed to burn a mixture of coal and waste coal. Under PURPA and PSC rules, the plant meets the definition of a "qualifying facility."

8

As part of its planning, AmBit sought to enter into a contract to sell electricity from the plant to Mon Power. However, Mon Power refused to agree to buy the electricity at the rates proposed by AmBit. AmBit thereafter filed a complaint with the PSC.

In two orders, the PSC ordered Mon Power to purchase the electricity generated by AmBit's Grant Town plant. The PSC also ordered the parties to enter into a contract with two important terms.[7] First, in a November 1987 order, the PSC required Mon Power to buy AmBit's power for thirty-five years. Since the Grant Town plant did not begin full operations until May 1993, the PSC determined that the contract bound the parties until the year 2027. Second, in an order entered in November 1988, the PSC required Mon Power to pay AmBit a fee that was, in part, based upon an avoided capacity rate of $27.25 per megawatt-hour.[8] The PSC found the fee to be "just and reasonable" and "in the public interest," as required by Rule 12.6. Accordingly, the PSC allowed the fee that Mon Power paid to AmBit to "be recovered from Mon Power's West Virginia customers[.]"

---

[7] Based on the PSC's orders, Mon Power and AmBit later entered into an "Electric Energy Purchase Agreement" or "EEPA." The parties' 2017 proposed modifications to the EEPA are at issue in this case.

[8] The PSC also allowed AmBit to charge Mon Power an avoided energy rate of $19.00 per megawatt-hour, tied to a capped tracking account. The avoided energy rates are only tangentially related to this appeal.

In January 2006, AmBit and Mon Power jointly petitioned the PSC for approval to modify their contract.[9] To the PSC, AmBit "represented its financial condition [was] dire." AmBit asserted that debt service payments were coming due between 2006 and 2017, and said it would cease operations without an increase in revenue.

The PSC entered an order in April 2006 approving three changes to the contract between AmBit and Mon Power. First, the PSC allowed the parties to extend the term of the contract for eight years, from 2027 to 2035. Second, the PSC allowed an increase in the avoided capacity rate from $27.25 to $34.25 per megawatt-hour, but only until September 30, 2017. Third, once AmBit completed payments on its debt, effective October 1, 2017, the avoided capacity rate would drop to $27.00 per megawatt-hour.

### D. PSC Order Under Appeal

In May 2017, AmBit and Mon Power again jointly petitioned the PSC for approval to modify their contract.[10] Important to this appeal, the parties sought to adjust the amount paid in relation to Mon Power's avoided capacity rate. Under the then-existing

---

[9] The record reflects that, between 1988 and 2005, several other proceedings occurred before the PSC regarding alterations to the Ambit-Mon Power contract. We do not see these other proceedings as critical to our analysis.

[10] The PSC's May 3, 2018 order indicates that the joint petition sought "Commission approval for Monongahela Power Company (Mon Power) *and The Potomac Edison Company (PE)* to pass-through . . . rates to utility customers." (Emphasis added.) Mon Power and Potomac Edison are currently subsidiaries of FirstEnergy Corporation, and both utilities provide service to customers in West Virginia. However, because the parties' arguments and the PSC's orders are centered on AmBit's contractual relationship with Mon Power, we have omitted Potomac Edison from our discussion.

10

contract, the avoided capacity rate was scheduled to drop from $34.25 to $27.00 per megawatt-hour in October 2017. However, AmBit declared that it still held debt totaling $20.8 million and, without an increase in rates, that it would close the Grant Town plant by the end of 2017 or early 2018. Mon Power agreed to support any increase in rates, but only to the extent the PSC allowed full recovery of the increase from Mon Power's retail customers. AmBit and Mon Power proposed to increase the avoided capacity rate in October 2017 to $40.00 per megawatt-hour for the remainder of the contract, until 2035. Petitioner Sierra Club subsequently intervened in the PSC action to oppose the joint petition.

In a detailed, thirty-five-page order dated May 3, 2018, the PSC partly approved and partly rejected the proposed contract modifications. AmBit had presented evidence to the PSC suggesting the proposed avoided capacity rate was reasonable when measured against the "levelized avoided costs" incurred over the life of the contract. The PSC gave this definition of that phrase in its order: "A levelized cost calculation is a number generated from the discounted present value of expected per unit payments over the term of an agreement." Essentially, AmBit asserted that taking all of the avoided capacity and operating costs approved by the PSC in 1987 and 1988, adjusting those costs for inflation, and then averaging them for the forty-three-year life of the contract, results in a levelized, per-megawatt-hour measure of avoided costs that could be fairly charged over the life of the contract under PURPA and PSC rules.

11

The math proposed by AmBit's expert looked like this: in 1987 and 1988, the PSC approved an avoided capacity rate of $27.25 per megawatt-hour, but also approved an avoided energy rate of $19.00 per megawatt-hour. Adding these costs together results in a total avoided cost of $46.25 per megawatt-hour, in 1988 dollars. However, by adjusting the data underlying these figures for inflation and by applying a discount rate, the expert opined that the "all-in levelized avoided cost rate" was $53.82 per megawatt-hour for the entire amended contract period ending in 2035. The record does not outline what the "all-in" costs were, but the parties seem to agree this means the aggregate of all avoided costs.

The PSC noted that levelized avoided cost rates over the term of the contract were not specifically discussed in its 1987 or 1988 orders. However, the rates in those orders involved projections of future avoided costs. Moreover, the PSC found the record supporting those orders showed "the underlying information necessary to generate an all-in levelized avoided cost was part of the negotiations between AmBit and Mon Power." Accordingly, the PSC adopted AmBit's levelized avoided cost approach to analyzing the parties' modified contract.

Nonetheless, the PSC rejected AmBit's inflation and discount rates and adopted its own, lower measures for "the time value of money," and as a result calculated different levelized avoided costs over the life of the contract. The PSC calculated that a proper levelized avoided cost rate was $52.74 per megawatt-hour, and construed this figure as a "levelized avoided cost rate ceiling." The PSC then reasoned that if the parties agreed

12

upon an avoided capacity rate that, when added to avoided energy costs, is "at or below the all-in levelized cost rate of $52.74 per [megawatt-hour] for the entire current contract term ending in 2035," then that avoided capacity rate "is 'just and reasonable' as provided in the PURPA Avoided Cost Standard."

The record reflects that staff members of the PSC prepared tables calculating various avoided capacity and energy costs for Mon Power, based on past data and future projections. Using this data, the PSC found that AmBit's proposal to increase the avoided capacity cost to a rate of $40.00 per megawatt-hour would, when combined with the avoided energy costs, exceed the levelized cost rate of $52.74 per megawatt-hour and would not be "just and reasonable" for Mon Power customers.[11] Accordingly, the PSC rejected AmBit's and Mon Power's request to raise the avoided capacity rate to $40.00 per megawatt-hour.

Instead, the PSC calculated that a just and reasonable avoided capacity rate would be $34.25 per megawatt-hour (the same rate AmBit had been receiving since 2006). The PSC reasoned that if Mon Power paid AmBit a rate equivalent to $34.25 for avoided capacity costs, and that cost was combined with varying projected avoided energy costs over the years, Mon Power would end up paying no more than $52.74 per megawatt-hour

---

[11] The PSC data showed that if Mon Power began paying AmBit $40.00 per megawatt-hour in avoided capacity costs in 2017, and that figure was combined with the PSC's projected avoided energy costs, then over the entire life of the contract AmBit would have collected $53.35 per megawatt-hour (or 61 cents per megawatt-hour in excess of the acceptable, levelized rate).

over the entire span of the contract. Averaging and discounting the total fee paid by Mon Power, from 1993 until 2035, AmBit will have received $52.74 for every megawatt-hour of electricity it supplied.

Accordingly, the PSC concluded that "the pass-through of a $34.25 per [megawatt-hour] fixed . . . capacity rate to the Mon Power . . . customers is consistent with the PURPA Avoided Cost Standard, and therefore just and reasonable." In summary, the PSC approved a contract rate whereby Mon Power would continue paying AmBit $34.25 per megawatt-hour for avoided capacity costs until 2035, and allowed Mon Power to continue passing that expense on to its retail customers.

Various parties to the proceedings below, including petitioner Sierra Club, asked the PSC to reconsider or clarify its order.[12] In an order dated September 5, 2018, the PSC clarified that its rate approval was effective from October 1, 2017. "[An avoided] capacity rate of $34.25 per [megawatt-hour] for periods subsequent to October 1, 2017 resulted in an all-in levelized payment to AmBit over the life of the [parties' contract] of $52.74 per [megawatt-hour] and was, therefore, reasonable for rate recovery under the PURPA Avoided Cost Standard[.]"

---

[12] The PSC's staff filed a petition for reconsideration. The Consumer Advocate Division of the PSC, the West Virginia Energy Users Group, and Sierra Club later filed letters supporting the staff's petition. AmBit and Mon Power filed a joint request for clarification.

Sierra Club now appeals the PSC's May 3 and September 5, 2018 orders, and argues that the orders are based upon a misapplication of legal principles.

## II. Standard of Review

The decisions of this Court firmly establish that "an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." Syl. Pt. 5, *Boggs v. Pub. Serv. Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970). Our standard for reviewing an order of the PSC is laid out in detail in Syllabus Point 2 of *Monongahela Power Company v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), but it "may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper." Syl. Pt. 1, *Cent. W.Va. Refuse, Inc. v. Pub. Serv. Comm'n of W.Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993). "The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Syl. Pt. 2, in part, *Monongahela Power Co.*, 166 W.Va. at 423, 276 S.E.2d at 180.[13]

---

[13] This Court's detailed standard of review is set forth in Syllabus Point 2 of *Monongahela Power Co.*, which provides in full:

### III. Discussion

Petitioner Sierra Club assigns two points of error to the PSC's orders regarding the agreement modifications reached by Mon Power and AmBit. First, Sierra Club argues that Rule 12.6, the PSC's PURPA-based avoided-cost standard, does not apply to *voluntary* agreements between traditional utilities and qualifying facilities. Instead, it takes the position that Rule 12.6 applies only to *compelled* purchases of power from qualifying facilities. Second, Sierra Club argues that if Rule 12.6 does apply to the agreement between Mon Power and AmBit, then the PSC should have measured the avoided costs as of 2017, at the time the parties entered into the contract, and not using data from 1987-88. As we discuss below, we reject both of these arguments.

---

In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

166 W.Va. at 423, 276 S.E.2d at 180.

Sierra Club's first argument challenges the application of Rule 12.6 of the PSC's rules to the facts of this case. Sierra Club contends that PURPA's avoided-cost standard in Rule 12.6 applies only to fees a traditional utility is *compelled* to pay under PURPA's mandate. Sierra Club argues that the avoided-cost standard does not apply to a *voluntary* agreement between a traditional utility and a qualifying facility – particularly an agreement that voluntarily amends an existing, already-approved agreement. Additionally, Sierra Club maintains that the PSC's authority terminated once the PSC forced the original PURPA agreement upon the parties in 1987-88, and that there is no authority for the PSC to apply Rule 12.6 to voluntary amendments to an existing PURPA agreement.

Furthermore, Sierra Club argues that the PSC failed to consider the effect of the fee paid by Mon Power under its statutory "ratemaking" authority, that is, its power to regulate electricity rates paid by retail consumers. Sierra Club notes that the PSC is charged by the Legislature with regulating traditional utilities, and in doing so with "[e]nsur[ing] that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, . . . and based primarily on the costs of providing these services[.]" W.Va. Code § 24-1-1(a)(4) [2015].[14] In this case, Sierra Club notes that the PSC allowed Mon Power to "pass through" to retail customers the fee it pays AmBit without making any of the specific findings listed in West Virginia Code § 24-1-1(a)(4).

_____

[14] *See also*, W.Va. Code § 24-2-2(a) [2018] ("The commission may investigate all rates . . . of public utilities. . . . The commission may change any intrastate rate, charge or toll which is unjust or unreasonable. . . . But in no case may the rate, toll, or charge be more than the service is reasonably worth, considering the cost of the service.").

17

The PSC never made findings that the fee resulted in electricity rates for retail customers that were just, reasonable, non-discriminatory, or based on the costs of providing services.

Instead, the PSC approved the contract modifications based upon its PURPA-based avoided-cost guidelines found in Rule 12.6. The PSC found that under Rule 12.6, the fee paid by Mon Power to AmBit was just and reasonable, and in the public interest, because the fee was equal to or less than the "levelized avoided cost" over the entire term of the contract. *See* W.Va. Code R. § 150-3-12.6.1. Rather than measure whether the agreement was just and reasonable to retail consumers under the PURPA-based avoided-cost standard in Rule 12.6, Sierra Club asserts that the PSC should have measured whether the increased rate was just and reasonable to retail customers under its traditional rate-making authority in West Virginia Code § 24-1-1(a)(4).

Respondents AmBit and the PSC respond by pointing out that, under PURPA, the Grant Town plant is a qualifying facility, and has been since its inception. Respondents further point out that PURPA was designed to encourage the development and continued use of alternative sources of power, and to drive traditional utilities to purchase power from qualifying facilities. They argue that the goals of PURPA do not end when a traditional utility begins buying power from a qualifying facility. Respondents maintain that measuring whether the fee paid by that utility is just and reasonable to the utility's retail customers under the PSC's PURPA-based avoided-cost standard in Rule 12.6 is a mandate that continues so long as the qualifying facility produces power. Respondents contend that so long as the fees paid by the traditional utility to a qualifying

18

facility meet the PURPA requirements in Rule 12.6, the utility may recoup those fees from its retail customers.

We begin our analysis by looking to the language of FERC's and the PSC's PURPA-based avoided-cost rules. FERC's rules provide the following guidance for rates paid by traditional utilities to qualifying facilities.

> (a) Rates for purchases.
>
> (1) Rates for purchases shall:
>
>> (i) Be *just and reasonable to the electric consumer* of the electric utility and in the public interest; and
>>
>> (ii) Not discriminate against qualifying cogeneration and small power production facilities.
>
> (2) Nothing in this subpart requires any electric utility to pay more than the avoided costs for purchases.

18 C.F.R. § 292.304(a) (emphasis added). FERC's rules provide that "a rate for purchases satisfies the requirements of paragraph (a)" – the paragraph quoted above – "if the rate equals the avoided costs[.]" 18 C.F.R. § 292.304(b)(2).

The PSC's PURPA-based avoided-cost rules are similar to FERC's rules. The PSC's Rule 12.6 states (with emphasis added):

> 12.6.1. Rates for purchases – Rates for purchases shall:
>
>> 12.6.1.a. Be *just and reasonable to the electric consumer* and in the public interest, and
>>
>> 12.6.1.b. Not discriminate against qualifying cogeneration and small power production facilities: however, nothing in this rule shall require an electric

19

> utility to pay more than the avoided costs for purchases[.]

W.Va. Code R. § 150-3-12.6.1. Rule 12.6 further provides, in pertinent part:

> 12.6.2. Relationship to avoided costs: . . .
>
> > 12.6.2.b. Rates for purchases . . . shall equal the avoided costs[.] . . . A rate so determined satisfies the requirements of Rule 12.6.1.

W.Va. Code R. § 150-3-12.6.2. To be clear, the term "purchase" in these regulations means "the purchase of electric energy or capacity or both from a qualifying facility by an electric utility." W.Va. Code R. § 150-3-12.1.1.b.

In support of its first argument, Sierra Club relies on a 1991 Texas Supreme Court opinion interpreting state utility regulations similar to the PSC's regulations. In *Public Utility Commission of Texas v. Gulf States Utilities Company*, Gulf States Utilities ("GSU") devised a scheme to avoid losing several large industrial customers. GSU formed a joint venture with the customers, and then sold two old GSU power plants to the venture. GSU agreed to operate the plants for the venture, and to convert the plants into qualifying facilities under PURPA guidelines. Finally, GSU voluntarily agreed to buy power from the venture's two qualifying facilities. *Gulf States*, 809 S.W.2d at 205.

As part of this complicated scheme to keep its industrial customers, GSU agreed to buy power from the venture at rates that would exceed GSU's avoided costs. The overall terms of the agreement provided that it was contingent upon receiving approval of the Texas Public Utility Commission ("PUC"). The PUC, going beyond the agreement

20

between GSU and the joint venture, looked at the effect of the agreement on other GSU retail customers. The PUC ruled "that GSU could *not* recover anything above avoided cost" from its retail customers and rejected the agreement. *Id.* at 206.

On appeal, the Texas Supreme Court examined avoided-cost regulations similar to West Virginia's Rule 12.6. The *Gulf States* court outlined two questions raised by the PUC's decision interpreting those avoided-cost regulations:

> (1) whether the regulations prohibit a utility from contracting for and paying a rate *in excess of its avoided cost* and (2) whether, if a utility may pay more than avoided cost, the regulations impose a limitation on how much of these payments the utility can recover from its ratepayers.

*Id.* at 205 (emphasis in original).

Regarding the first question, the *Gulf States* court read the Texas PURPA-based avoided-cost standard "as operating solely to set the rates that the [PUC] can *compel* a utility to pay for a [qualifying facility's] power if the utility and the [qualifying facility] are unable to reach a voluntary agreement." *Id.* at 207 (emphasis in original). Conversely, the court found that the avoided-cost standard "does not impose a ceiling on the amount a utility can *contract* to pay for a [qualifying facility's] power, nor does it limit the amount a utility can recover from its ratepayers under such voluntary arrangements." *Id.* The *Gulf States* court concluded that, so long as the agreement was voluntary, a traditional utility and qualifying facility were not bound by the rules and could agree to rates "*above, below, or equal to* avoided cost." *Id.* at 208.

21

Sierra Club bases its argument solely upon the answer to the first question discussed by the court in *Gulf States*, and it argues that the same interpretation should apply in this case. Sierra Club asserts that we should follow *Gulf States* and rule that the avoided-cost rate restrictions in Rule 12.6 apply only to contracts that are compelled, not voluntary contracts.

We, however, find the *Gulf States* case to be distinguishable and decline to follow the Texas Supreme Court's reasoning, largely because Sierra Club fails to account for the court's discussion of the second question in the case. That question concerned whether, under the Texas PURPA-based avoided-cost rules, a traditional utility could pass through to its retail customers fees that exceeded avoided costs. In the instant case, Mon Power explicitly sought the PSC's approval of the modified agreement so the PSC could approve the pass-through of the additional avoided costs to its retail customers. That, however, did not occur in *Gulf States*; the court in *Gulf States* avoided answering the question posed because GSU *never* asked the Texas PUC to approve the rates it was charging its retail customers. The Texas Supreme Court stated that the PUC "was not called upon to set rates[.]" *Id.* at 210. Nonetheless, in dicta, the Texas court stated the PUC could, in the future, consider whether to allow GSU to "recover purchased power payments in excess of its avoided cost in future rate proceedings if GSU establishes to the Commission's satisfaction that the payments are reasonable and necessary expenses." *Id.* In other words, the *Gulf States* court said that in a future proceeding the PUC could do precisely what the PSC already did in this case: apply the PURPA-based avoided-cost

standard as a ceiling to decide the maximum amount that the traditional utility could pass on to its retail customers.

Another reason that we find the *Gulf States* decision distinguishable is because of its factual posture. The complicated scheme in *Gulf States* was wholly voluntary. Moreover, the court's discussion in *Gulf States* makes clear that GSU's decision was driven by its need to retain large industrial customers, and the loss of those industrial customers would have resulted in drastically higher rates for GSU's other retail customers. *Id.* at 205. In the instant case, the relationship between Mon Power and AmBit has been subject to the PSC's compulsion and regulation since 1987, and the PSC's decision is based on much simpler considerations. In sum, we decline to follow the reasoning of the court in *Gulf States*.

The PSC interprets the PURPA-based avoided-cost standard in Rule 12.6 as applying to *any* agreement between a traditional utility and a qualifying facility, regardless of whether the agreement was reached voluntarily or was compelled by the PSC, before the traditional utility may pass through the costs of the agreement to its retail customers. The rule makes no distinction between voluntary and involuntary agreements. The PSC's rules do allow traditional utilities and qualifying facilities to enter voluntary agreements with rates and terms different from those required by Rule 12.[15] However, the fact that

---

[15] Rule 12 permits voluntarily negotiated agreements:

23

traditional utilities and qualifying facilities *may* negotiate a contract does not mean the utility can recover an amount greater than the avoided cost from its retail customers. We see little difference in the contract being reviewed upfront to determine if it is "just and reasonable to the electric consumer" under PURPA and Rule 12.6, or reviewed later to determine if the rates Mon Power seeks to collect from retail consumers are just and reasonable under W.Va. Code § 24-1-1(a)(4).

Accordingly, we hold that under Rule 12.6, before a traditional electric utility may pass on to its retail customers the rates it is paying to a qualifying facility because of an electric energy purchase agreement, the PSC may require the utility to show the rates are just and reasonable to the utility's customers, in the public interest, and do not exceed the utility's avoided costs. This is permitted regardless of whether the agreement with the qualifying facility was reached voluntarily or was compelled by the PSC. *See* W.Va. Code R. § 150-3-12.6 [2018].

---

12.2.2. Negotiated rates or terms -- Nothing in Rule 12 et seq:

> 12.2.2.a. Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this rule; or

> 12.2.2.b. Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase.

W.Va. Code R. § 150-3-12.2.2.

24

The PSC's driving obligation is to ensure that West Virginia's retail customers are not paying for uneconomical power purchases. Accordingly, we find no error with the PSC's determination to apply the avoided-cost standard in Rule 12.6 to both voluntary and compelled agreements, and modifications to those agreements, between traditional utilities and qualifying facilities.

Sierra Club's second argument on appeal is that the PSC misapplied Rule 12.6 and its avoided-cost standard to the agreement between Mon Power and AmBit. Sierra Club argues that the avoided-cost standard applies only at the time an obligation to pay those rates is incurred. In other words, Sierra Club contends that the PSC should have weighed the 2017 agreement based upon Mon Power's current avoided costs, and not looked back some three decades to reconstruct an "avoided cost ceiling" based upon 1987-88 data.

Sierra Club points to the language of Rule 12.6, which requires that the rates for a traditional utility's purchase of electricity from a qualifying facility "shall equal the avoided costs[.]" W.Va. Code R. § 150-3-12.6.2.b. It asserts that when a qualifying facility chooses to "lock-in" the fee it will receive in a contract, the rule requires the fee to be based upon the avoided costs at the time the contract is entered into. Sierra Club maintains that this conclusion is compelled by Rule 12.6.3, which provides, in part, that a qualifying facility shall have the option:

> 12.6.3.b. To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such

25

> purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
>
>> 12.6.3.b.1. The avoided costs calculated at the time of delivery, or
>>
>> 12.6.3.b.2. The avoided costs calculated at the time the [legally enforceable] obligation is incurred.

W.Va. Code R. § 150-3-12.6.3. Sierra Club reasons that, under this rule, the PSC could only consider avoided costs at the beginning of the specified term – that is, when it approved the 2017 modifications to the parties' contract.

Respondents AmBit and the PSC respond that the levelized avoided cost was, in fact, calculated based upon avoided costs calculated from the time the parties' legal obligation was incurred in 1987-88. Moreover, the respondents assert that there is no one perfect way to calculate avoided costs, and that use of levelized avoided costs over the life of the contract was envisioned when FERC crafted the rules implementing PURPA. The respondents' argument builds upon the 1980 statement of FERC discussing the adoption of the PURPA avoided-cost regulation upon which Rule 12.6.3 was based. *See* 45 Fed.Reg. 12,214 (Feb. 25, 1980). Like Rule 12.6.3, the FERC regulation allows a qualifying facility to provide power "pursuant to a legally enforceable obligation . . . based on . . . [t]he avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(ii). FERC stated that § 292.304(d) was

> intended to reconcile the requirement that the rates for purchases equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future

26

avoided costs. Some of the comments received regarding this section stated that, if the avoided cost of energy at the time it is supplied is less than the price provided in the contract or obligation, the purchasing utility would be required to pay a rate for purchases that would subsidize the qualifying facility at the expense of the utility's other ratepayers. The Commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. The Commission does not believe that the reference in the statute to the incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between qualifying facilities and electric utilities.

Many commenters have stressed the need for certainty with regard to return on investment in new technologies. The Commission agrees with these latter arguments, and believes that, in the long run, "overestimations" and "underestimations" of avoided costs will balance out.

45 Fed.Reg. at 12,224.

AmBit and the PSC argue that FERC specifically approved of the use of levelized avoided costs, or avoided costs measured over the entire term of the parties' contract. As FERC stated in its 1980 comments:

A facility which enters into a long term contract to provide energy or capacity to a utility may wish to receive a greater percentage of the total purchase price during the beginning of the obligation. For example, a level payment schedule from the utility to the qualifying facility may be used to match more closely the schedule of debt service of the facility. *So long as the total payment over the duration of the contract term does not exceed the estimated avoided costs, nothing in these rules would prohibit a State regulatory authority . . . from approving such an arrangement.*

*Id.* (emphasis added).

Our research has revealed that neither Congress nor FERC "prescribe a specific methodology for the states' calculations of avoided cost. In point of fact, there are literally dozens of methodologies to calculate avoided cost." Steven Ferrey, 2 Law of Independent Power § 7.3 (2014). A nationally recognized study commissioned by the PSC in 1982 similarly found "a wide diversity of methods of calculating avoided costs." National Regulatory Research Institute, "The Appropriateness and Feasibility of Various Methods of Calculating Avoided Costs," 103 (June 1982).[16] The study noted that the "various methods of avoided cost calculation differ in their theoretical appropriateness, conformance to legal requirements, and feasibility." *Id.* at ii. "Careful examination of the avoided cost calculation techniques . . . reveals a multitude of factors that can be considered in adopting avoided cost methods." *Id.* at 6. "In some states the application of avoided cost methods must reflect special local conditions, such as excess capacity, or the extensive use of power pooling arrangements." *Id.* at 22. Because of this complexity, FERC has stated that, "[i]t is up to the States, not this Commission, to determine the specific parameters of individual [qualifying facility] power purchase agreements. . . . Similarly, whether the particular facts applicable to an individual [qualifying facility] necessitate modifications of other terms and conditions of the [qualifying facility]'s contract with the

---

[16] The authors state the study's report was prepared "under a contract with the West Virginia Public Service Commission." The report may be found at http://ipu.msu.edu/wp-content/uploads/2016/12/NRRI-Appropriatness-Feasibility-June-82-1.pdf .

purchasing utility is a matter for the States to determine." *West Penn Power Co.*, 71 FERC ¶ 61153, 61495 (May 8, 1995).

The PSC is entitled under PURPA to take fact-specific actions reasonably designed to give effect to FERC's rules. The PSC did so in this case by evaluating and applying a levelized avoided cost rate over the life of the parties' contract, and in doing so reflected the evidence in existence when it first approved the contract in 1987 and 1988. The record supports the levelized approach chosen by the PSC. We see no basis to second guess or invalidate the PSC's chosen method for evaluating the AmBit-Mon Power contract. This is because "the rulings, interpretations and opinions" of the PSC "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Appalachian Power Co. v. State Tax Dep't of W.Va.*, 195 W.Va. 573, 583, 466 S.E.2d 424, 434 (1995) (citations omitted). Hence, this Court gives substantial deference to the PSC's construction of a statute. *See* Syl. Pt. 4, *Appalachian Power Co.*, 195 W.Va. at 579, 466 S.E.2d at 430 ("A valid legislative rule is entitled to substantial deference by the reviewing court."). Further, out of deference to the PSC's expertise, "[t]his Court will not substitute our judgment for that of the Public Service Commission on controverted evidence." Syl. Pt. 2, *Chesapeake & Potomac Tel. Co. of W.Va. v. Pub. Serv. Comm'n of W.Va.*, 171 W.Va. 494, 300 S.E.2d 607 (1982). Sierra Club fails to show how the PSC's decision is contrary to the evidence, is without evidence to support it, or is arbitrary. Moreover, the levelized approach chosen by the PSC to measure Mon Power's

29

avoided costs was within the bounds of PURPA's requirements.  Accordingly, we find no error.

## IV. Conclusion

We affirm the PSC's orders dated May 3 and September 5, 2018.

Affirmed.