IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

_____

No. 24-75

_____

FILED

November 13, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

APPALACHIAN POWER COMPANY and
WHEELING POWER COMPANY,
Petitioners,

v.

PUBLIC SERVICE COMMISSION
OF WEST VIRGINIA,
Respondent.

_____

Appeal from the Public Service Commission of West Virginia
Case Nos. 21-0339-E-ENEC, 22-0393-E-ENEC, and 23-0377-E-ENEC
AFFIRMED, in part; REVERSED, in part; and REMANDED

_____

Submitted: September 4, 2024
Filed:  November 13, 2024

William C. Porth, Esq.
Anne C. Blankenship, Esq.
Robinson & McElwee PLLC
Charleston, West Virginia

Keith D. Fisher, Esq.
American Electric Power
Service Corporation
Charleston, West Virginia

Elbert Lin, Esq.
Hunton Andrews Kurth LLP
Richmond, Virginia
Counsel for Petitioners

Jessica M. Lane, Esq.
Susan M. Stewart, Esq.
Public Service Commission
of West Virginia
Charleston, West Virginia
Counsel for Respondent

Robert F. Williams, Esq.
Heather B. Osborn, Esq.
Charleston, West Virginia
Counsel for Amicus Curiae
The Consumer Advocate Division of the
Public Service Commission of West
Virginia

Barry A. Naum, Esq.
Steven W. Lee, Esq.
Spilman Thomas & Battle, PLLC
Mechanicsburg, Pennsylvania

Susan J. Riggs, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Counsel for Amicus Curiae
West Virginia Energy Users Group

H. Brann Altmeyer, Esq.
Jacob C. Altmeyer, Esq.
Phillips, Gardill, Kaiser,
& Altmeyer, PLLC
Wheeling, West Virginia
Counsel for Amicus Curiae
The West Virginia Coal
Association, Inc.

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "'"The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33, (99 S.E.2d 1).' Syl. Pt. 5, *Boggs v. Pub. Serv. Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970)." Syl. Pt. 1, *Sierra Club v. Pub. Serv. Comm'n of W. Va.*, 241 W. Va. 600, 827 S.E.2d 224 (2019).

2.      "'The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.' Syl. Pt. 1, *Cent. W.Va. Refuse, Inc. v. Pub. Serv. Comm'n of W.Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993)." Syl. Pt. 2, *Sierra Club v. Pub. Serv. Comm'n of W. Va.*, 241 W. Va. 600, 827 S.E.2d 224 (2019).

**HUTCHISON, Justice**:

In Expanded Net Energy Cost ("ENEC") proceedings before the Public Service Commission of West Virginia ("Commission"), Appalachian Power Company ("APCo") and Wheeling Power Company ("WPCo") (collectively "petitioners"), public utilities providing electric service to West Virginia customers, sought to recover approximately $552.9 million in an accumulated monthly under-recovery balance for the period March 1, 2021, through February 28, 2023. In its January 9, 2024, order, the Commission disallowed recovery of approximately $231.8 million of the requested amount because the Commission concluded it was incurred as the result of imprudent and unreasonable decisions by petitioners relating to their inadequate stockpiling of coal necessary to fuel their respective coal-fired electric generating facilities. The lack of adequate fuel, the Commission found, caused petitioners to restrict self-generation during periods when self-generation would have been less expensive than purchasing energy which, in turn, required petitioners to rely on more expensive alternative purchased power. The Commission ordered that the remaining balance of the requested under-recovery (approximately $321.1 million) be assessed to consumers through an ENEC rate increment over a ten-year period, including a 4% carrying charge, to begin September 1, 2024.

Upon our review of petitioners' appeal of the Commission's order, we affirm the order to the extent the Commission determined that petitioners failed to manage their power plant operations in a reasonable, prudent, and efficient manner during the period under review resulting in their failure to maintain adequate fuel supplies—specifically, as

1

they relate to the Commission's ruling that petitioners acted imprudently and unreasonably, we affirm the order's findings of fact, conclusions of law, and the Commission's reasons therefor as stated in its order, and we adopt and incorporate by reference the order to that limited extent. However, we reverse the Commission's order insofar as it disallowed $231.8 million of the requested under-recovery balance because the Commission's calculation was based upon certain extra-record evidence of which petitioners were not afforded notice or an opportunity to be heard, in violation of their constitutional right to due process of law. Accordingly, we remand the matter for further proceedings for the specific and sole purpose of affording petitioners the opportunity to address that evidence in connection with the quantification of ENEC costs that were incurred as the result of petitioners' imprudent decisions during the time period under review.[1]

## I.    Factual and Procedural Background

*Introduction*

The John Amos and Mountaineer Plants, owned and operated by APCo, and the Mitchell Plant, in which WPCo owns a 50% undivided interest, are coal-fired electric generating facilities.

---

[1] The Consumer Advocate Division of the Public Service Commission of West Virginia, the West Virginia Energy Users Group, and the West Virginia Coal Association, Inc., as amici curiae, submitted briefs in this appeal and the Court has considered them in conjunction with the parties' arguments.

ENEC cases are filed annually with the Commission to enable petitioners "to adjust rates for fuel related generation costs and certain purchased power and transmission related costs[;]" they are "specialized and limited rate proceeding[s]" that allow petitioners "to avoid filing a full base rate case to reflect changes in those cost components."[2]

ENEC rates are "based on projections of future ENEC cost elements. An important element of the ENEC procedure [is] an over[-] or under-recovery mechanism whereby companies using the ENEC procedure would defer costs that exceeded or were less than their ENEC revenues and request recovery of under-recoveries or rate crediting of over-recoveries (true-up mechanism)."[3] Normally, the Commission reviews over- or under-recovery balances and builds them into rates annually so that accumulated balances even out from year to year. However, this "true-up mechanism" "is subject to Commission review of the incurred costs and determination that the costs resulted from prudent actions on the part of the utility and were reasonable. Absent such a finding, there [is] no guarantee that under-recoveries [will] be passed on to customers."[4]

Indeed, the present matter involves petitioners' effort to recover ENEC costs of $552.9 million, which reflect accumulated monthly net under-recoveries from March 1, 2021, through February 28, 2023. Following the completion of a Commission-ordered

---

[2] May 13, 2022, Commission Order, Case No. 21-0339-E-ENEC *3.

[3] *Id.*

[4] *Id.*

review of whether petitioners acted reasonably and prudently in incurring the requested ENEC costs and the holding of an evidentiary hearing, the Commission determined that petitioners did not act prudently and reasonably and so it disallowed the recovery of $231.8 million of the $552.9 million under-recovery balance that petitioners requested. The Commission authorized a prospective recovery of the remaining $321.1 million requested in under-recoveries amortized over ten years beginning September 1, 2024, with a carrying charge of 4%.

In disallowing the recovery of $231.8 million, the Commission determined that petitioners "failed to manage their fuel supplies and power plant operations in a reasonable, prudent, and efficient manner" during the relevant time period and that, had they acted prudently, they "would not have experienced the unreasonably low inventory levels [of coal] that they now use to excuse their inability to maximize the use of their coal-fired power plants." Instead of generating energy at their own plants, petitioners purchased excessive "amounts of power from the PJM market[5] at prices that were at the highest level

_____

[5] PJM Interconnection, LLC "operates a competitive wholesale electricity market and manages the reliability of its transmission grid. . . . In managing the grid, PJM centrally dispatches generation and coordinates the movement of wholesale electricity in all or part of" West Virginia, twelve other states, and the District of Columbia. Petitioners purchase energy from PJM. According to petitioners, APCo also owns and operates its own gas-fired electric generating facilities and hydroelectric facilities, but they also purchase power from various facilities (hydroelectric, wind, solar and coal-fired) under "purchased power agreements."

in PJM History."[6] The Commission deemed this conduct "unreasonable and the result of imprudent decisions regarding coal inventories, coal procurement, bidding into the PJM energy market, and minimization of out-of-service time." If petitioners had planned and operated their plants prudently, the Commission found, they could have reduced their ENEC costs in West Virginia by at least $231.8 million during the relevant time period.

Understanding petitioners' challenge to the Commission's decision requires understanding that the 2023 ENEC filing is heavily intertwined with petitioners' previous two ENEC filings (the 2021 and 2022 cases). Therefore, we generally recount below, in simplest terms, the Commission's orders entered in those cases because they document the

---

[6] APCo and WPCo are vertically integrated load-serving utilities with their own power supply. As explained in the order, in ENEC proceedings, there are references to "sales to" and "purchases from" PJM. For vertically integrated load-serving utilities with their own power supply such as petitioners,

> the term "sale" refers to self-generated power that is delivered from the power plants into the transmission system and is accounted-for as a "sale" into PJM. The term "purchase" refers to the load of the utility which is taken from the transmission system and is accounted-for as a "purchase." In effect, the total net transaction of a load serving vertically integrated utility . . . is self-generation to serve load with an accounting performed by PJM. For example, if the load is 10 million Megawatt Hour (MWh) and the self-generation is 10 million MWh during a period when the PJM locational marginal price (LMP) is $40 per MWh, although the accounting may be referred to as a $400 million sale to PJM and a $400 million purchase from PJM, the net purchase from PJM would be zero and the only ENEC cost remaining to be paid by load would be the cost of the self-generation.

record and explain the Commission's decision to order a review of the under-recoveries that were incurred for reasonableness and whether petitioners prudently managed their fuel supply and purchased power decisions.

*Case No. 21-0339-E-ENEC*

The Commission became concerned as to the cause of petitioners' growing ENEC under-recovery beginning with their 2021 ENEC filing (Case No. 21-0339-E-ENEC), which revealed petitioners were planning to purchase large amounts of more expensive energy from PJM rather than maximizing generation from their own plants at a lower cost. Petitioners proposed to increase ENEC rates to produce an additional $73 million in annual ENEC revenues. Of that amount, $55.4 million was for under-recovery of fuel costs, including $32 million in deferred under-recovery collection from 2020,[7] and $17.6 million in projected costs for the forecast period (September 1, 2021, through August 31, 2022). The Commission conducted an evidentiary hearing.

In its order entered September 2, 2021, the Commission observed that petitioners' "projected ENEC costs include significant amounts of purchased power which

---

[7] In Case No. 20-0262-E-ENEC (the 2020 ENEC case), petitioners requested an additional $82 million in annual ENEC revenues. An ENEC rate increase of approximately $50.1 million beginning September 1, 2020, was agreed to in recognition of the health and economic hardships caused by the COVID-19 pandemic. The remaining $32 million petitioners originally requested in that case was deferred until the 2021 ENEC case.

6

could be prudent if it is clear that purchased power costs will be less expensive when compared to generation at the West Virginia power plants." The Commission determined that petitioners projected ENEC costs that included utilizing their power plants at capacity factors[8] well below that which should be the basis for such costs but that the evidence, as described more fully in its September 2, 2021, order, dictated that the public interest would be better served by petitioners maximizing generation from their own power plants. At a minimum, the Commission found, petitioners should be using a capacity factor of 69% for their projected ENEC costs. The Commission thus adjusted (i.e., reduced) petitioners' projected costs to reflect less purchased power and more self-generation and approved ENEC rates using a capacity factor of 69%. To aid the Commission in monitoring petitioners' "success at increasing generation at its power plants," it ordered petitioners to file monthly reports as closed entries in the case.[9]

On September 13, 2021, petitioners filed a petition for reconsideration or clarification of the September 2, 2021, Commission Order. The Commission granted the petition to the extent it corrected a miscalculation in its prior order resulting in an increase

---

[8] "Capacity factor" refers to the net generation over a period compared to the maximum possible generation over that period.

[9] The Commission ordered that the reports show net generation from all APCo and WPCo power plants by month; retail and wholesale energy load by month; purchased power energy purchases by month and supplier; and purchased power demand and energy costs by month and supplier.

7

in petitioners' ENEC rates by $31.4 million.[10] The Commission also reopened the case for petitioners to explain the significant growth in the under-recovery of ENEC costs as reported by petitioners to the Commission and, as explained in its March 2, 2022, order, "to determine what is currently happening in the PJM markets and what is happening with the ability of [petitioners] to utilize their coal-fired power plants." The Commission

> reviewed with alarm the monthly filings submitted by [petitioners] as closed entries in this case. Those filings indicate that there may have been significant deflections from the projections regarding purchased power volumes and purchased power costs and a failure to use lower cost generation in lieu of more expensive purchased power. As a result, the under-recoveries booked by [petitioners] is now reported to be at an alarming level.[11]

The Commission's decision to reopen the 2021 ENEC proceeding was supported by, among other things, specific data provided by petitioners in their closed entry reports, including evidence that, despite the set target of a minimum 69% capacity factor from their West Virginia plants, "which appear to be able to produce power at costs that are well below the cost of purchased power, the capacity factors have not approached that level in September, October, and November 2021." Petitioners submitted additional evidence and an evidentiary hearing was conducted to address the growing under-recovery.

---

[10] The Commission declined to address petitioners' request for clarification concerning the requirement that petitioners operate their coal-fired power plants at a 69% capacity factor.

[11] Petitioners reported that the actual under-recovery balance had grown to $176.1 million as of November 30, 2021.

In a Commission Order entered on May 13, 2022, Commission Staff was directed to conduct an in-depth prudency review of the energy costs incurred by petitioners. In the order, the Commission reiterated its concern

> that [petitioners] have been over-relying on PJM energy market purchases in lieu of planning for maximum self-generation through utilization of the capacity they own, and which customers are paying for, at the John Amos, Mountaineer and Mitchell power plants. [Petitioners] claim that they plan on running their plants when it is economical to do so. However, for a variety of reasons including fuel shortages they did not do that at the worst possible time as the PJM energy market prices grew to unprecedented levels beginning in the fall of 2021 and continued at unprecedented levels through the winter of 2021/2022. [Petitioners] claim that when the PJM market prices exploded, they attempted to obtain more fuel for their plant, but to no avail. However, part of the fuel problem faced by [petitioners] was the result of their decision to allow fuel inventories to decline to levels which were unreasonably low.

> It is clear that reliance on the PJM energy markets is producing unreasonable cost levels and ENEC under-recoveries that [petitioners] now ask West Virginia customers to pay. The Commission recognized the excessive cost of relying on the PJM energy market in September 2021 when we ordered [petitioners] to increase self-generation in lieu of the PJM market and high cost purchased power contracts. If [petitioners] had been able to increase self-generation and foregone reliance on PJM energy, then the recent spate of under-recoveries would have been greatly reduced or eliminated. Instead, we now learn that utilization of their power plants was limited by unreasonably low fuel supplies and an inability to acquire fuel supplies to accommodate the maximum possible capacity utilization of their power plants.

> We were not told by [petitioners] at the initial stage of this proceeding that they were scraping the bottom of their coal inventory which would make it difficult for them to use their power plants at maximum levels no matter how much could be saved by self-generation. It is clear that [petitioners'] fuel

9

supply planning and overreliance on market purchases are self-inflicted wounds.

. . . .

It is not clear to us how [petitioners] were not more concerned in late 2020 and 2021 that rising gas prices and other modifications that have been driven by PJM policy changes in recent years would make the benefits of low PJM market prices a distant memory. Instead of allowing coal inventories to decline precipitously, [petitioners] should have been doing everything possible to use their plants more and increase fuel inventories at the same time.

For these reasons, and other reasons reflected in its May 13, 2022, order, the Commission directed Commission Staff to conduct an in-depth review of the reasonableness of petitioners' net ENEC costs and petitioners' "policies and procedures for maximizing and maintaining adequate fuel inventory levels [and] bidding their plants into the PJM market to maximize economical self-generation[.]" The Commission further "require[d] evidence of proper and prudent plant maintenance and availability so that the benefits of self-generation can be realized when the opportunities arise."

The Commission deferred consideration of the reported under-recovery balance for rate-making purposes pending receipt of the prudency review; however, it granted petitioners recovery of an additional $93 million for projected increased costs "to prevent future possible rate shock to the customers" and noted that the recovered costs "will be subject to future review and may be subject to disallowance if the Commission determines that they are unreasonable and the result of imprudent management of generation assets, generation costs and purchased power expenses" by petitioners.

10

On April 19, 2022, petitioners filed Case No. 22-0393-E-ENEC ("2022 ENEC case") requesting $297 million in ENEC revenues over and above the amount the Commission approved in the reopened 2021 ENEC case. By order entered February 3, 2023, the Commission determined that reasonableness of the costs and revenues requested in the 2022 ENEC case "will depend on the prudence of [petitioners'] management of fuel supplies and purchased power decisions." The Commission reiterated its concern relating to petitioners' "historical and projected fuel and purchased power costs and continuing under-recoveries" and its belief that "self-generated power has been shown to be more economical than reliance on more expensive and less reliable purchased power." The Commission also noted that it "based the projected costs underlying the current ENEC rates on maximizing self-generated power at [petitioners'] power plants which we determined should be capable of operating at a minimum 69 percent capacity factor." As explained more fully in its February 3, 2023, order, the Commission stated that petitioners could most easily satisfy their burden of proving that they acted prudently and reasonably if they achieve the 69% annual capacity factor. However, the Commission cautioned that, if petitioners fail to achieve that minimum, then to demonstrate prudence, they would need to show that they (1) "maintain[ed] adequate economical fuel supplies, (2) ke[pt] plants available for generat[ing] the maximum amount of time, (3) maxim[ed] reduction . . . of outage times, . . . . and (4) effectively bid[] to clear the PJM energy market . . . ." Noting that it had recently granted a $93 million revenue increase, "which also [was] still subject

to a final determination based on the reasonableness of the underlying costs[,]" the Commission deferred a decision on the requested increase until the completion of the prudency review by Commission Staff.

*Case No. 23-0377-E-ENEC*

Petitioners filed Case No. 23-0377- E-ENEC ("2023 ENEC case") on April 28, 2023, requesting the recovery of approximately $641.7 million, including $552.9 million in an under-recovery balance accumulated from March 1, 2021, through February 28, 2023, (i.e., the months encompassed by the 2021, 2022, and 2023 ENEC cases) and a projected increase of ENEC costs in the amount of $88.8 million for the forecasted period of September 1, 2023, through August 31, 2024.[12]

Also on April 28, 2023, Commission Staff filed its prudency review, entitled "Independent Technical Prudency Review of the Actions Affecting the Operations of Amos, Mountaineer, and Mitchell Coal Plants Case Nos. 22-0393-E-ENEC and 21-0339-E-ENEC" ("prudency report"), that was prepared by the firm Critical Technology Consulting ("CTC"). The Commission subsequently entered an order reopening the 2021 and 2022 ENEC cases to hear evidence on the prudency report. The parties pre-filed

---

[12] By order entered September 13, 2023, the Commission granted the requested $88.8 million in forecasted costs because no party challenged the methodology or reasonableness of the estimates and projections supporting it.

testimony and exhibits and a hearing was conducted over three days (September 5-7, 2023).[13]

In its highly detailed, thorough, and well-reasoned order, the Commission again observed that it was tasked with

> determin[ing] if [petitioners] prudently, efficiently, and reasonably used economic self-generation from their own power plants in lieu of higher cost net PJM power. In order to determine if excessive costs were incurred because of [petitioners'] decisions and actions that left them with insufficient supplies of coal for economical self-generation, it is also critical for the Commission to consider whether [petitioners] used the minimum amount of high-priced PJM energy market electricity over the period of review or whether the net power supplied through PJM transactions in lieu of self-generation was excessive.

The Commission found that, despite petitioners' past assurances that "their coal-fired plants are valuable assets that provide a physical hedge against high and volatile PJM energy prices," petitioners, nonetheless, failed to "prudently maintain adequate fuel supplies and manage operations of their . . . plants" to provide that physical hedge. Noting "a clear decline in coal stockpiles from the end of 2020 to mid-2021" and specific increases in the PJM market prices over that same period, the Commission determined that petitioners "did not react prudently to the warning signals they were receiving." As noted by the Commission, the prudency report found that petitioners'

> plants were dispatched by PJM at an aggregate 32.5 percent per year. CTC found that [petitioners'] coal plants are in good

---

[13] The hearing on the prudency report was conducted immediately prior to the evidentiary hearing on the 2023 ENEC case.

13

condition and capable of dispatch. CTC found, however, that over the ten-year period prior to the report being filed with the Commission, [petitioners] placed an overreliance on net power supply from the PJM market and significantly reduced self-generation. Further [petitioners] did not appear to take seriously the Commission decision in the 2021 ENEC and 2022 ENEC that directed [them] to self-generate more of their required power.

As discussed in the Prudency Report and testimony, [petitioners] built up larger than normal coal stockpiles through 2020. However, by May 2021, [petitioners] should have been concerned by the diminishing stockpiles of coal in inventory. [Petitioners] should have realized in May 2021, but no later than July 2021, that the coal shortages at their plants would prevent them from self-generating at a meaningful level to offset rising PJM Energy market prices. In July 2021, the stockpiles were critically short, yet no action was taken until September 20, 2021, when [petitioners] issued a coal supply Request for Purchase (RFP). By this point, it was already too late to replenish the stockpiles. Only one coal supplier responded in the affirmative to the RFP and even that offer was rescinded.

The Commission further noted CTC's concern that petitioners failed "to take seriously the Commission directive to increase the plant capacity factors to 69 percent." *Id.* Specifically, petitioners failed to

ma[k]e changes in the fuel procurement process or bidding their energy into PJM to allow them to provide more self-generation and increase the capacity factor of their plants. [Petitioners] failed to tell a key employee, Mr. Dial, who was in charge of fuel procurement, of the 69 percent capacity factor target set forth in the September 2, 2021 Commission Order. Eighteen days later, Mr. Dial issued an RFP for more coal, unaware, pursuant to his testimony, of a need to not only replenish the stockpiles, but also to be able to meet the 69 percent average generating rate target that had been established by the Commission.

14

Though petitioners had presented testimony during the hearing on the petition for reconsideration in the 2021 ENEC case that they issued the September 2021 RFP as a result of the September 2, 2021, Commission Order, the evidence revealed that, even after entry of the March 2, 2022, Commission Order on the petition for reconsideration, petitioners had yet to inform Mr. Dial "to procure sufficient coal that would allow [petitioners] to achieve the 69 percent capacity factor target if PJM energy prices continued to increase above earlier projected prices and far above the low levels of PJM market prices in 2020." Indeed, the Commission determined that the evidence showed that petitioners failed to procure enough coal to generate at a 69% annual capacity factor.

As stated in the order, the Commission considered petitioners' position "regarding the unexpectedness and exigency of the situation they found themselves in when market prices skyrocketed, and [that] they were caught with insufficient coal supply to maximize their use of their lower cost generation." However, the Commission "[could] not agree that [petitioners] are blameless and without fault in building up an ENEC under-recovery of over $550 million." The Commission determined that

> having insufficient supplies of coal in inventory and scheduled for delivery into [petitioners'] plants led to the lowest level of generation in the last twenty years during a period when the PJM LMP spiked to the highest levels experienced in the last twenty years. This "perfect storm" led to an inability to maximize economic generation while using excessive amounts of PJM power. The burden of a significant portion of the resulting excessive costs must fall on [petitioners] because their fuel supply failures and related market offer strategies that lead to rejection of their power plants for dispatch by PJM directly caused the excessive ENEC costs.

15

(Footnotes omitted). The Commission found that "ENEC under-recoveries were climbing dramatically due to over-reliance on third-party power supplies at rising cost levels that could have been offset by self-generation if [petitioners] had acted reasonably and prudently in a timely manner[,]" and that petitioners "demonstrated an imprudent lack of ongoing attention to assure that they had a continuous supply of coal to maintain adequate stockpiles of coal to maximize generation when it was cheaper than PJM energy prices." Indeed, the Commission determined that the evidence showed that petitioners failed in "their responsibility to structure their coal supply contracts in a manner that would allow them to respond to rising PJM LMPs by increasing the utilization of their power plants without running out of coal" by entering into "a mix of long-term, medium-term, and short-term contracts and spot purchases when necessary."

Concluding that petitioners' imprudent management resulted in their incursion of "excessive net ENEC costs that should not be shouldered entirely by customers," the Commission disallowed $231.8 million of the requested ENEC under-recoveries. The Commission authorized a prospective recovery of the remaining $321.1 million in under-recoveries over ten years beginning September 1, 2024, with a carrying charge of 4%.

It is from this order that petitioners now appeal.

## II. Standard of Review

This Court has previously recognized the highly specialized knowledge and expertise of the Commission in considering complex cases such as this:

16

This Court's standard of reviewing the Commission's order in this case is highly deferential given that this case involves complex issues and arcane concepts that fall within the special competence of the Commission and are governed by Commission precedent. This Court previously has recognized that "[a] public utility commission has broad powers in supervising and regulating the actions of utilities within its jurisdiction in the respects provided for in the statutory or constitutional provisions by which its authority is conferred." *United Fuel Gas Co. v. PSC,* 154 W.Va. 221, 241, 174 S.E.2d 304, 316 (1969) (citation omitted). Further, this Court has recognized that "on questions of expediency, or as to what would be best in the interest of the petitioner, or the public served . . . the Legislature intended that the judgment of the [Public Service] Commission should prevail." *United Fuel Gas Co. v. PSC,* 73 W.Va. 571, 591, 80 S.E. 931, 939 (1914).

*W. Va. Citizen Action Grp. v. Pub. Serv. Comm'n of W. Va.*, 233 W. Va. 327, 331–32, 758

S.E.2d 254, 258–59 (2014). (Emphasis added). Further,

"'The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33, (99 S.E.2d 1)." Syl. Pt. 5, *Boggs v. Pub. Serv. Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970).

"The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper." Syl. Pt. 1, *Cent. W.Va. Refuse, Inc. v. Pub. Serv. Comm'n of W.Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993).

17

Syl. pts. 1 and 2, *Sierra Club v. Pub. Serv. Comm'n of W. Va.*, 241 W. Va. 600, 827 S.E.2d 224 (2019). *See Monongahela Power Co.*, 166 W.Va. at 425, 276 S.E.2d at 181 ("[B]ecause the Commission is experienced with the intricacies of the rate-making process we will ordinarily not substitute our judgment for that of the Commission on controverted evidence."). With these standards to guide us, we now consider petitioners' appeal.

## II. Discussion

### A.

Petitioners' first two assignments of error are related and will be addressed together. Petitioners argue that the Commission used an incorrect legal standard when assessing whether the accumulated under-recovery balance for the period March 1, 2021, through February 28, 2023, was the result of unreasonable and imprudent decision-making by petitioners and that the Commission further erred in concluding that petitioners acted imprudently and unreasonably.

In determining that petitioners failed to prove that they managed their fuel supplies and power plant operations (including purchased power costs) in a reasonable, prudent, and efficient manner, the Commission noted that it considered petitioners' "contemporary action[s] . . . based on what [was] known or reasonably knowable at the time the action[s] [were] taken" as well as "a continuum of actions leading up to a decision point." The parties agree that the well-settled legal standard requires the Commission to examine petitioners' decisions leading up to and resulting in the ENEC costs they seek to

recover from ratepayers based upon facts and information available at the time such decisions were made. In past Commission proceedings, the Commission has stated:

> To find that a utility has acted imprudently, the Commission must have evidence before it to show that the utility's decisions were unreasonable based on actual data that was available at the time the utility was making its decisions. Another way of saying this is that the Commission would have to determine that an alternative utility action was reasonable and should have been made based upon facts available at the time the decision was made. The Commission may not find imprudence based on outcomes or new facts that the utility cannot have reasonably been expected to know, or assume.[14]

Petitioners argue that by also considering "a continuum of actions leading up to a decision point," the Commission impermissibly deviated from the appropriate standard by effectively evaluating petitioners' decision-making relating to their coal procurement efforts (or lack thereof) and consequent inability to economically operate their coal-fired power plants resulting in their purchasing of expensive energy from the PJM market "on the basis of ultimate outcomes considered with 20/20 hindsight." According to petitioners, the Commission ignored evidence that petitioners' coal procurement practices comported with industry standards and adapted to changing circumstances and that, not unlike coal-fired electric utilities located outside of West Virginia, petitioners were faced with what they characterize as unforeseeable and challenging circumstances over which they had no control, including that, beginning in the later months of 2021, natural gas and coal prices were increasing unexpectedly and coal was unavailable to purchase. Petitioners also point

---

[14] *In re Hope Gas, Inc.*, 2006 WL 2134651 *12 (W. Va. P.S.C. April 3, 2006).

to evidence that large quantities of coal that they previously contracted to purchase were not delivered. Simply put, petitioners argue that they did not act imprudently based upon information that was known and knowable to them at the time and the fact that, during the time period at issue, they had insufficient supplies of coal to generate their plants causing them to purchase large amounts of power at high-cost levels to serve their customers was not their fault.

The Commission counters that there was evidence presented that, beginning in the late spring of 2021, the coal market was tightening and the price of natural gas was increasing; that expert witness testimony presented in July of 2021 expressed concern over a significant amount of petitioners' coal supply being concentrated with only two suppliers; that petitioners did not issue an RFP for coal until September 20, 2021, when petitioners' coal supply was already diminishing; that petitioners failed to inform their fuel procurement officer that petitioners were ordered by the Commission to target a 69% capacity factor and so the RFP did not request sufficient coal supplies to meet that target; that petitioners' mix of coal contracts of varying lengths was not sufficient to ensure an adequate supply of coal; and that petitioners' own projections in the 2021 ENEC case indicated that they were over-relying on purchased power even when cost levels were increasing from 2020 levels and it was more economical to self-generate. Noting that petitioners previously assured the Commission that their coal-fired plants would provide a physical hedge against high and volatile electric market prices, the Commission argues that petitioners failed to provide that physical hedge by imprudently disregarding trends and

market signals affecting their coal procurement practices.[15] The Commission contends that the finding that petitioners were imprudent and unreasonable in their decision-making and that the resulting incursion of excessively high under-recoveries should not be passed on to customers was supported by the evidence and should be affirmed.

Upon our considered review, and ever mindful that the complexity of the issues and subject matter falls within the special competence of the Commission, we afford great deference to the Commission's thorough and well-reasoned conclusion that petitioners failed to manage their power plant operations in a reasonable, prudent, and efficient manner resulting in an inadequate stockpile of coal to fuel their facilities that, in turn, caused petitioners to purchase energy at cost levels that were much higher than what it would have cost them to generate from their own plants.[16] Petitioners have failed to establish that the Commission's decision in this regard was arbitrary, contrary to the evidence, without evidence to support it, or resulted from a misapplication of the law,[17] and so, as they relate to the Commission's determination that petitioners acted imprudently and

---

[15] *Cf. In re Hope Gas, Inc. dba Dominion Hope*, 2013 WL 2370525 *1 (W. Va. P.S.C. May 10, 2013) (regarding a gas utility's burden of proving reasonable and prudent hedging actions, "the prudence of management decisions will not be evaluated with the benefit of 20/20 hindsight. . . .[H]owever, . . . at the time those hedging decisions are made, they must be based on a continuing and reasonable understanding of market conditions, market trends, and other factors that are shaping current and future gas supply and demand and that will likely impact future gas costs.").

[16] *See W. Va. Citizen Action Grp.*, 233 W. Va. at 331-32, 758 S.E.2d at 258-59.

[17] *See Sierra Club*, 241 W. Va. at 601, 827 S.E.2d at 225, syl. pt. 1.

21

unreasonably, we affirm the January 9, 2024, order's findings of fact, conclusions of law, and the Commission's stated reasons therefor, and adopt and incorporate them by reference into this opinion. We further find that the Commission's determination that petitioners acted imprudently and unreasonably in their decision-making was made in light of information and circumstances that petitioners knew or should have known at the time their decisions were made, as more fully set forth in the Commission's order.

B.

Petitioners' next assignment of error challenges the Commission's conclusion that $231.8 million of the $552.9 million accumulated under-recovery balance requested was the result of petitioners' imprudent and unreasonable decision-making discussed above in Section A. The Commission ordered that this amount be disallowed for recovery in ENEC rates. At issue is whether the Commission violated petitioners' fundamental due process rights by relying on information outside of the evidentiary record in arriving at its disallowance calculation.

Petitioners argue that the Commission improperly used coal reports that petitioners submitted to the Commission on a monthly basis,[18] but that were not made a part of the record in the proceedings below, to unilaterally modify an exhibit that petitioners submitted after the hearing had concluded. Specifically, on the third and final day of the

---

[18] Electric utilities such as petitioners are required to submit to the Commission, on a monthly basis, certain information relating to their purchases of coal or other fuel. *See* W. Va. Code § 24-2-14 (1975).

22

proceedings, the Commission requested that petitioners submit evidence of their "market bids and cost-based bids in the PJM market, the corresponding LMP clearing prices, and the resulting market clearing volumes of their self-generation" covering the review period March 1, 2021, through February 28, 2023. Petitioners complied with the Commission's request and timely submitted the exhibit ("Post-Hearing Exhibit 4") after the proceedings had concluded. Petitioners argue that the Commission proceeded to calculate the $231.8 million disallowance by supplanting the cost-based bid prices reflected in petitioners' exhibit with prices calculated by the Commission using information it obtained from the coal reports that were not presented as evidence during the hearing. Petitioners argue that, critically, exactly how the Commission used the information from the coal reports in its calculation of the disallowance is not apparent from the Commission's order and so petitioners are unable to verify either the calculation's accuracy or rebut its legitimacy. According to petitioners, the Commission used prices that were unrealistically low and without any basis in the actual evidentiary record. Petitioners contend that they had no notice that the Commission would be relying on this extra-record evidence and, importantly, were not afforded an opportunity to challenge or otherwise address the manner in which the Commission used it in calculating the extent to which, in the Commission's view, petitioners acted imprudently and unreasonably. Petitioners argue that the Commission violated their fundamental due process rights.

The Commission responds that the purpose of the proceedings was to ascertain the prudency of petitioners' coal procurement practices and their "inability to

23

offset high-priced purchased power. . . with more economic self-generation," and that petitioners knew that if the Commission determined that petitioners had acted imprudently in incurring excessive ENEC costs, then the next step would be for the Commission to quantify the extent to which those costs were imprudently incurred. Without addressing whether it was a violation of petitioners' due process rights to inscrutably and significantly modify petitioners' Post-Hearing Exhibit 4 with extra-record evidence (i.e., the coal reports), the Commission offers a lengthy explanation justifying the reasons why it found it necessary to resort to the use of the reports in calculating the disallowance of $231.8 million. The Commission argues that petitioners were afforded a fair evidentiary hearing.

It is beyond cavil that a proceeding "'requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding.' . . . A functional analysis of the Commission's proceedings leads unerringly to the conclusion that they . . . are quasi-judicial proceedings." *Appalachian Power Co. v. Pub. Serv. Comm'n*, 162 W. Va. 839, 849-50, 253 S.E.2d 377, 384 (1979) (quoting *Morgan v. U.S.*, 298 U.S. 468, 480 (1936)). As such, parties to the Commission's proceedings are entitled to basic constitutional protections, including due process of law. *See* Syl. Pt. 2, in part, *State ex rel. Ellis v. Kelly,* 145 W. Va. 70, 112 S.E.2d 641 (1960) ("'Due process of law, within the meaning of the State and Federal constitutional provisions, extends to actions of administrative officers and tribunals. . . ."). "Procedural due process rights entitle an individual to representation by counsel, notice, an opportunity to be heard, and the right

24

to present evidence." *Marcus v. Holley*, 217 W. Va. 508, 527, 618 S.E.2d 517, 536 (2005). "A due process analysis is founded upon the concept of fundamental fairness." *Id*.

*Ohio Bell Telephone Company v. Public Utilities Commission of Ohio*, 301 U.S. 292 (1937), involved administrative proceedings before the Public Utilities Commission of Ohio ("PUCO") to set rates for Ohio Bell Telephone Company ("Ohio Bell") customers. PUCO ordered Ohio Bell to file with it a complete inventory of all of its property so that a hearing could be held to determine "the fair value of said property" as of a date certain (June 30, 1925) and "the just and reasonable rates for the service thereby to be furnished" to customers. *Id.* at 295. "A long investigation followed, the evidence being directed in the main to the value of the property on the basis of historical cost and cost of reproduction, and to the deductions chargeable to gross revenues for depreciation reserve and operating expenses generally." *Id.* at 295-96. Based upon the evidence, PUCO fixed a tentative value as of the date certain but then "[i]t undertook also to fix a valuation for each of the years 1926 to 1933." *Id.* at 296. In doing so, "it took judicial notice of price trends during those years" based upon property taxes; "building trends" from a recognized engineering construction magazine; labor trends; and court decisions, and "modif[ied] the value which it had found as of the date certain by the percentage of decline or rise applicable to the years thereafter." *Id.* at 297. Ultimately, PUCO determined that, based upon this evidence, Ohio Bell was in receipt of significant excess earnings and ordered a refund to customers. *Id.* at 298.

Ohio Bell protested, arguing that

25

> the trend percentage accepted in the findings as marking a decline in values did not come from any official sources which [PUCO] had the right to notice judicially; that they had not been introduced in evidence; that the company had not been given an opportunity to explain or rebut them; and that by their use [PUCO] had denied a fair hearing in contravention of the requirements of the Fourteenth Amendment."

*Id.* at 298. PUCO reaffirmed its decision and the Supreme Court of Ohio affirmed.

Ohio Bell appealed to the United States Supreme Court, which reversed the decision of the lower court, acknowledging that the lower tribunals took "judicial notice that there has been a depression, and that a decline in the market values is one of its concomitants." *Id.* at 301. However, the Supreme Court cautioned, "[h]ow great the decline has been for this industry or that, for one material or another, in this year or the next, can be known only to the experts, who may even differ among themselves." *Id.* Thus, "notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence. 'It does not mean that the opponent is prevented from disputing the matter by evidence if he believes it disputable.'" *Id.* at 301-02 (citations omitted). Stated another way, when judicially noticed facts are "put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect." *Id.* at 302. The Supreme Court instructed that

> [t]he fundamentals of a trial were denied to the appellant when rates previously collected were ordered to be refunded upon the strength of evidential facts not spread upon the record. [PUCO] had given notice that the value of the property would be fixed as of a date certain. Evidence directed to the value at that time had been laid before the triers of the facts in thousands of printed pages. To make the picture more complete, evidence had been given as to the value at cost of additions and

26

retirements. Without warning or even the hint of warning that the case would be considered or determined upon any other basis than the evidence submitted, the Commission cut down the values for the years after the date certain upon the strength of information secretly collected and never yet disclosed. The company protested. It asked disclosure of the documents indicative of price trends, and an opportunity to examine them, to analyze them, to explain and to rebut them. . . . Upon the strength of these unknown documents refunds have been ordered for sums mounting into millions, [PUCO] reporting its conclusion, but not the underlying proofs. The putative debtor does not know the proofs today. This is not the fair hearing essential to due process. It is condemnation without trial.

*Id.* at 300.[19] This Court has likewise cautioned,

Although we recognize that the Public Service Commission may, in accordance with the well-developed principles governing official notice, occasionally go beyond the confines of the record for information bearing upon its decision, we state unequivocally that we do not favor this procedure except in extremely limited circumstances. The Commission places its decisions and orders in a precarious position when it bases them on extra-record adjudicative facts without advising a party that it intends to do so and without affording the party the opportunity for cross-examination and rebuttal. This is particularly true where there is no cogent or compelling reason for the Commission's failure to offer evidence on the record.

---

[19] *Accord Union Elec. Co. v. F.E.R.C.*, 890 F.2d 1193, 1202-03 (D.C. Cir. 1989) (provision of the federal Administrative Procedure Act providing that "[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence of record, a party is entitled . . . to an opportunity to show the contrary" that "encompasses a chance not only to dispute the facts noticed but also to 'parry [their] effect,' i.e., to offer evidence or analysis contesting the Commission's inferences.")

*Kanawha Valley Transp. Co. v. Pub. Serv. Comm'n of W. Va.*, 159 W. Va 88, 98, 219 S.E.2d 332, 339 (1975). *See id.* at 88, 219 S.E.2d at 334, syl. pt. 5 (holding that "[p]arties to a [certificate of convenience and necessity] revocation hearing before the Public Service Commission should be fully informed of the evidence submitted or to be considered and should be given an opportunity to cross-examine witnesses, to inspect documents and offer evidence in rebuttal.").

We agree with petitioners that it was fundamentally unfair for the Commission to consult and rely on evidence that was neither mentioned nor admitted into the record below to significantly adjust the cost-based bid prices that petitioners submitted in their exhibit to quantify the not insignificant disallowance of $231.8 million. That the coal reports were submitted to the Commission by petitioners as a matter of course[20] is of no moment—even if it were appropriate for the Commission, on its own, to reach into its

---

[20] On March 22, 2024, the Commission filed a motion to supplement the appellate record with the coal reports to which the Commission cited in its January 9, 2024, order. Although the motion states that the coal reports "were used by the Commission in making its decision" in this case and that "the coal reports were inadvertently omitted from the Commission record previously filed with th[is] Court[,]" in connection with the instant appeal, the Commission does not dispute that the coal reports were not actually introduced or otherwise addressed during the course of the proceedings below. Further, despite the Commission's suggestion during oral argument that the Commission took judicial notice of the reports, *see* W.Va. R. Evid. 201, there is no indication in the Commission's order that it did so. Regardless, the Commission fails to address petitioners' argument that they were not afforded notice and an opportunity to be heard as to how the Commission used the reports in quantifying the disallowance. *See Ohio Bell*, 301 U.S. at 301-02. The Commission states simply: "The disingenuous attempt by Petitioners to claim no knowledge of their own reports and to claim that the Commission should not consider information filed by the Petitioners themselves is absurd. Petitioners are most certainly aware of the coal reports that they prepare and file with the Commission."

records for this factual information, the Commission does not dispute that the manner in which it used the information in the reports to calculate the disallowance was not disclosed to petitioners. Simply put, petitioners had no opportunity to examine, analyze, rebut, or "parry its effect," *Ohio Bell*, 301 U.S. at 302, and the Commission has offered no cogent or compelling reason for its failure to offer this evidence on the record. *Kanawha Valley Transp.*, 159 W. Va at 98, 219 S.E.2d at 339. Due process "is ultimately measured by the concept of fundamental fairness." *State ex rel. Blankenship v. Richardson*, 196 W. Va. 726, 739, 474 S.E.2d 906 919 (1996). Because petitioners were entitled to, but not afforded, notice of how the Commission used the information gleaned from the reports and the opportunity to examine, analyze, rebut, and "parry its effect,"[21] we remand this matter to the Commission for that specific and singular purpose.[22]

## IV. Conclusion

Based upon all of the foregoing, we affirm the Commission's order insofar as it concluded that petitioners failed to manage their power plant operations in a reasonable, prudent, and efficient manner, and we adopt and incorporate by reference the

---

[21] To be clear, the Court takes no position as to whether the Commission's use and manner of use of the coal reports were appropriate. Rather, our concern is that basic concepts of fundamental fairness dictate that petitioners should have been given notice and an opportunity to be heard on this evidence.

[22] Because we have ordered that this matter be remanded to the Commission, we decline to address petitioners' remaining assignment of error that the Commission exceeded its authority in ordering that the remaining under-recovery balance be recovered through an ENEC rate increment over a period of ten years, with a 4% carrying charge.

29

Commission's findings of fact, conclusions of law, and reasons stated therefor in the order to that limited extent. We reverse the order insofar as it disallowed $231.8 million of the requested under-recoveries and remand this matter to the Commission for the specific and sole purpose of affording petitioners the opportunity to address the coal reports that the Commission relied upon in quantifying the disallowance.

Affirmed, in part; Reversed, in part; and Remanded.